RECORD NOS. 13-2190(L); 13-2191

𝕴𝖓 𝕿𝖍𝖊

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝕺𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝕱𝖔𝖗 𝕿𝖍𝖊 𝕱𝖔𝖚𝖗𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## UNITED STATES OF AMERICA,

*Intervenor/Plaintiff - Appellant,*

**and**

## UNITED STATES EX REL. OMAR BADR,

*Plaintiff,*

**v.**

## TRIPLE CANOPY, INC.,

*Defendant – Appellee.*

---

## UNITED STATES EX REL. OMAR BADR,

*Plaintiff - Appellant,*

**v.**

## TRIPLE CANOPY, INC.,

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

_____

**BRIEF OF APPELLANT
UNITED STATES EX REL. OMAR BADR**

_____

**Paul A. Prados (VSB # 71374)**
**Earl "Trey" Mayfield (VSB # 41691)**
**Milt C. Johns (VSB # 42305)**
**Christopher M. Day (VSB # 37470)**
**DAY & JOHNS, PLLC**
**10560 Main Street, Suite 218**
**Fairfax, VA  22030**
**(703) 268-5600**

*Counsel for Appellant Omar Badr, Relator*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2190__        Caption: __United States ex rel. Badr v. Triple Canopy, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Omar Badr__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
         financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
         If yes, identify entity and nature of interest:

          (beyond the parties)

5.      Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
         If yes, identify any publicly held member whose stock or equity value could be affected
         substantially by the outcome of the proceeding or whose claims the trade association is
         pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
         If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Earl N. Mayfield, III_____        Date:   ___October 11, 2013_____

Counsel for: _Omar Badr_____

# CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on ___October 11, 2013____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

United States                                          Tara M. Lee, Esq.
by Peter Hyun, Esq.                                    Joseph C. Davis, Esq.
Assistant U.S. Attorney, E.D. Va.                      (for Jonathan D. King, Esq. & Paul D. Schmitt, Esq.)
2100 Jameson Avenue                                    DLA PIPER LLP (US)
Alexandria, Virginia 22314                             11911 Freedom Drive, Suite 300
                                                       Reston, VA 20190

_/s/ Earl N. Mayfield, III_____        _____October 11, 2013_____
         (signature)                                        (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE ............................................................. 2

STATEMENT OF FACTS ................................................................... 4

SUMMARY OF ARGUMENT ............................................................ 10

ARGUMENT ...................................................................................... 11

    STANDARD OF REVIEW ........................................................... 11

    DISCUSSION OF THE ISSUES ................................................... 11

    I.    The Pleading Standard for FCA Claims ................................ 12

    II.   The District Court Erred In Dismissing Badr's Complaint for Purportedly Failing to Meet Rule 9(b) Pleading Requirements for FCA Claims ................................................................... 13

        A.    ISSUE 1: The District Court Erred in Holding Relator Badr's Complaint Insufficiently States Causes of Action Under the FCA ................................................................ 16

            1.    FCA § 3729(a)(1)(B) Requires Only that a Relator Plead a False Statement that is Capable of Influencing a Government Payment, With No Requirement that it Actually Influence such a Payment ....................................................................... 17

i

2.  FCA § 3729(a)(1)(A) Does Not Require a Relator's Complaint to Identify Specific Claims for Payment to the Government Under Rule 9(b), Only the Specifics of the Fraudulent Scheme that Likely Induced the Government to Make Such Payments .......................................................................19

B.  ISSUE 2: The District Court Erred in Holding Relator Badr Needed Personal Knowledge of Every Fact Supporting Counts II-V Concerning Bases at Which He Was Not Personally Present .......................................................26

III.  ISSUE 3. The District Court Erred in Holding Relator Badr Lacks Standing Under the FCA to Participate in the Continued Litigation of Intervened Count I of His Complaint .............................29

CONCLUSION .................................................................................31

REQUEST FOR ORAL ARGUMENT .................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abrahams v. Kindred Healthcare, Inc.,*
  2003 U.S. Dist. LEXIS 7163 (D.Del. April 28, 2003) .................................30

*Allison Engine v. United States ex rel. Sanders*,
  553 U.S. 662 (2008)........................................................................17, 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................13

*Ballou v. General Electric Co.*,
  393 F.2d 398 (1st Cir. 1968).........................................................28

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................12, 13, 14

*Cioca v. Rumsfeld*,
  720 F.3d 505 (4th Cir. 2013) .......................................................11

*Condor Am. v. American Power Development*,
  128 F.R.D. 229 (S.D. Ohio 1989)..................................................28

*E. I. du Pont de Nemours & Co. v. Kolon Indus.*,
  637 F.3d 435 (4th Cir. 2013) .......................................................5

*Erickson v. Pardus*,
  551 U.S. 89 (2007)..........................................................................12

*Glynn v. EDO Corp*,
  710 F.3d 209 (4th Cir. 2013) .......................................................24, 25

*Harrison v. Westinghouse Savannah Riv. Co.*,
  176 F.3d 776 (4th Cir. 1999) ("*Harrison I*").............................*passim*

*Hokama v. E.F. Hutton & Co.,*
  566 F. Supp. 636 (C.D. Cal. 1983)...............................................28

*Ignacio v. United States*,
674 F.3d 252 (4th Cir. 2012) ........................................................11

*Lusby v. Rolls-Royce*,
570 F.3d 849 (7th Cir. 2009) ........................................................21

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)......................................................................29

*Tal v. Hogan*,
453 F.3d 1244 (10th Cir. 2006) ....................................................28

*United States ex rel. Feldman v. City of New York*,
808 F. Supp. 2d 641 (S.D.N.Y. 2011) ..........................................29

*United States ex rel. Carter v. Halliburton* (*"Carter II"*),
2009 U.S. Dist. LEXIS 63649 (E.D.Va. July 23, 2009)..........................26, 27

*United States ex rel. Ebeid v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ........................................................21

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .................................................*passim*

*United States ex rel. Harrison v.*
*Westinghouse Savannah River Co.* (*"Harrison II"*),
352 F.3d 908 (4th Cir. 2003) ......................................................18

*United States ex rel. Jajdelski v. Kaplan, Inc.*,
517 Fed. Appx. 534,
2013 U.S. App. LEXIS 2990 (9th Cir. Feb. 13, 2013)................................25

*United States ex rel. Loughren v. Unum Group*,
613 F.3d 300 (1st Cir. 2010).........................................................17

*United States ex rel. Nathan v. Takeda Pharmaceuticals*,
707 F.3d 451 (4th Cir. 2013) ....................................................22, 23

*United States ex rel. Ortega v. Columbia Healthcare*,
240 F. Supp. 2d 8 (D.D.C. 2003)...............................................30-31

*United States ex rel. Semtner v. Medical Consultants, Inc.*,
   170 F.R.D. 490 (W.D.Okla. 1997) ...............................................30

*United States ex rel. Simpson v. Bayer Healthcare*,
   732 F.3d 869 (8th Cir. 2012) .....................................................21

*United States ex rel. Tahlor v. AHS Hosp. Corp.*,
   ___ F. Supp. 2d ___,
   2013 U.S. Dist. LEXIS 15226 (D.N.J. Oct. 31, 2013) ..................................29

*United States ex rel. Walker v. R&F Properties of Lake County, Inc.*,
   443 F.3d 1349 (11th Cir. 2005) .....................................................21

*United States ex rel. Wall v. Circle C Constr., LLC*,
   697 F.3d 345 (6th Cir. 2012) .....................................................17

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008)................................................ 13, 14, 18

*United States v. Neifert-White Co.*,
   390 U.S. 228 (1968)................................................16

**Statutes:**

28 U.S.C. § 1291 ..............................................................1

28 U.S.C. § 1331 ..............................................................1

31 U.S.C. § 3729 *et seq.* ("FCA")...................................................*passim*

31 U.S.C. § 3729(a) .......................................................... 17

31 U.S.C. § 3729(a)(1)(A) ....................................................*passim*

31 U.S.C. § 3729(a)(1)(B) ....................................................*passim*

31 U.S.C. § 3729(a)(2) ....................................................... 17

31 U.S.C. § 3729(a)(7) ..................................................... 17, 18

31 U.S.C. § 3729(b)(4)....................................................18

31 U.S.C. § 3730(c) ................................................................30

Fraud Enforcement & Recovery Act of 2009 ("FERA") ..........................17, 19, 20

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ........................................................1

Fed. R. Civ. P. 8(a) ...............................................................13

Fed. R. Civ. P. 8(a)(2) ............................................................12

Fed. R. Civ. P. 9(b) .........................................................*passim*

Fed. R. Civ. P. 12(b)(6) .......................................................11, 28

**Other Authorities:**

1 John T. Boese, CIVIL FALSE CLAIMS & QUI TAM ACTIONS
    § 1.09 (4th ed. 2011) ..........................................................17

S. Rep. 99-345 at 25-26, 1986 U.S.C.C.A.N. 5290-91 ............................30

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331, as the case involves a dispute involving the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). This Court has jurisdiction pursuant to 28 U.S.C. § 1291, as this case is appealed from a final decision of the district court. This appeal is from the order of dismissal of June 19, 2013 and the final order dismissing the remaining counts on July 23, 2013, granting Judgment for the Appellee/Defendant, Triple Canopy Inc. ("TCI"). *See* Joint Appendix ("JA") at 218, 246. Pursuant to FRAP 4(a)(1)(B), both Appellant/Relator Omar Badr ("Badr") and the Appellant/Intervenor United States timely filed notices of appeal on September 20, 2013.

## STATEMENT OF THE ISSUES

Relator Badr alleges that defendant TCI knowingly and intentionally falsified firearms qualifications for individuals it fraudulently billed to the United States as "guards" under contracts to protect five U.S. military bases in Iraq. Relator Badr's appeal presents the following questions:

1.      Whether the district court erred as a matter of law in holding that Relator Badr failed to state a claim for relief because his complaint did not allege with sufficient particularity the existence of any false claims, or the submission of a false claim to the government, by the Defendant.

2.      Whether the district court erred as a matter of law in holding that Relator Badr needed personal knowledge of the contractual provisions governing other military bases or events that transpired at those bases at which he was not personally present, when he had personal knowledge of the fraud perpetrated at those other bases.

3.      Whether the district court erred as a matter of law in holding that Relator Badr lacked standing to bring Count I of his Complaint because it was superseded by the United States' Complaint, when the FCA provides the Relator with litigation rights in the intervened Count.

## STATEMENT OF THE CASE

The instant *qui tam* Complaint concerns Defendant TCI's defrauding of the United States by providing Ugandan "guards" at U.S. bases in Iraq who were utterly unqualified to provide the protection for which the United States was paying.  TCI charged the U.S. Government millions of dollars for hundreds of Ugandans to purportedly protect U.S. military personnel at bases in Iraq, when TCI knew those guards did not know how to use their weapons, and could not even hit targets, much less meet the Government's contractually-established minimum shooting requirements.  To ensure that it would be paid for the security services it was not providing, TCI repeatedly falsified the guards' shooting scores.  Even when TCI's senior managers in the U.S. were notified of the fraud, they did

2

nothing to correct it. TCI obtained millions of dollars in government funds as a result of its fraud, all while leaving Americans at five different Iraqi bases undefended.

Former TCI employee Omar Badr filed a *qui tam* suit as a Relator under the FCA in the U.S. District Court for the Eastern District of Virginia on March 21, 2011 alleging FCA violations by TCI. JA 009-022. The Government intervened with its own complaint on October 25, 2012, asserting FCA claims similar to Relator's Count I, as well as common law claims. JA 023-052. The Government's intervention Complaint concerned TCI's fraud at the Al Asad Airbase, where Badr had been stationed and personally witnessed the fraudulent conduct, and which had been the subject of Count I of Relator's Complaint. Counts II-V of Relator's Complaint—in which the Government did not intervene—concerned the use of the same unqualified "guards" from Al Asad, who were then shipped to four other U.S. bases in Iraq with TCI security contracts.

The district court dismissed all of the FCA claims brought by Relator Badr and the Government (as well as the Government's common law fraud claims) on June 19, 2013. JA 218-245. In particular, the district court dismissed Relator's Counts II through V concerning TCI's fraud at four military bases in Iraq using the very Ugandans Badr had personally witnessed were unqualified, holding Badr "fails to sufficiently allege presentment of a claim to the Government for

3

payment," and that he lacked "personal knowledge" of that fraud because he was not physically present at the bases to which those unqualified "guards" had been sent. JA 236, 238.  The district court also dismissed Count I of Relator's Complaint, holding he lacked standing because the Government's intervention Complaint had "superseded" Relator's factually similar Count I. JA 227 n.1.

The district court dismissed the Government's remaining common law counts on July 23, 2013.  JA 246.  The June 19, 2103 and July 23, 2013 orders were timely appealed by the Government and Badr on September 20, 2013.

## STATEMENT OF FACTS

Relator's Complaint alleges that TCI, a defense contractor the U.S. Government paid millions of dollars to protect Americans serving at five different bases in Iraq, failed to provide that protection and instead intentionally defrauded the U.S. Government by charging for protection services it was not providing.  The Government's contracts with TCI specifically required that TCI provide trained guards for those bases, guards who knew how to use their weapons and who could meet minimum U.S. Army target shooting requirements.   Rather than provide individuals who were qualified as guards under the contractual terms, TCI knowingly substituted hundreds of Ugandans who not only had no idea how to use their weapons, but who could not meet the target qualifications. Further, once TCI personnel became aware that the "guards" could not, in fact, perform their most

4

basic security function, they were ordered to fabricate weapons qualifications

scores to mislead any Government auditors who might check those records to

ascertain if TCI was actually providing qualified guards to protect U.S. personnel

and facilities.  When Relator Badr notified senior TCI management of the fraud in

person, TCI not only ignored the fraud, but then sent the unqualified Ugandans to

provide "security" at other U.S. bases in Iraq, for which TCI received additional

payments.  Because this case was decided upon a motion to dismiss, all factual

allegations contained in the Relator's Complaint must be accepted as true and

construed in the light most favorable to him and the Government.  *E. I. du Pont de*

*Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2013).  Accordingly,

the facts herein are taken from Relator Badr's Complaint. JA 009-022.

From approximately June 2009 through June 2010, TCI provided security

services at the Al Asad Airbase in Iraq, pursuant to Joint Contracting Command-

Iraq Contract Number W91GDW-07-D-4022 ("the Contract").  JA 011 ¶ 6.  The

Contract required TCI to provide a high level of security at internal entry control

points and perimeter security operations to prevent unauthorized access to U.S.

military facilities.  JA 011 ¶ 7.  Accordingly, TCI was contractually obligated to

ensure that all of its security personnel deployed at Al Asad were qualified with the

TCI-issued weapon, an ARM-1 (an AK-47 model rifle fitted for 5.56 mm

munitions).  Proof of qualification with the ARM-1 consisted of shooting at 25

meters on the Army Alternate Course Qualifications ("Alt-C"), which the Contract required be conducted annually. The Alt-C's minimum qualification required males and females to score a minimum of 23 rounds out of 40 from the 25-meter line. JA 011 ¶ 8. The scorecard used was the Army DA-Form 3595, NOV 2002. JA 011 ¶ 10. The Contract also required TCI to replace any individuals not meeting the Contract's obligations within 21 days, at no additional cost to the U.S. Government. JA 011 ¶ 9.

TCI began its security contract at Al Asad in June 2009, with 18 American personnel, and approximately 330 Ugandan guards (the approximate number maintained under the Contract for its duration at Al Asad), each of whose file indicated he/she had met the minimum qualification score of 23 in Kampala, Uganda approximately three weeks earlier. JA 011-012 ¶¶ 11-12. Under the Contract, the U.S. Government paid TCI approximately $1100 each month per guard, and other amounts for the American supervisors. TCI received a total of approximately $4.35 million for the Ugandan guards at Al Asad. JA 012 ¶ 12.

Shortly after arriving at Al Asad in June 2009, TCI's American supervisors discovered the Ugandans were unable to load or unload their weapons, despite their files stating they had qualified three weeks earlier. Upon taking the Ugandans to the range to zero in their weapons, the American managers ascertained that none of the guards met the Army's minimum target qualifications;

6

indeed, the majority of the Ugandans could hit only the paper, rather than the target on the paper. All of TCI's American supervisors were aware that the Ugandans did not meet the Contract's minimum security requirements. JA 012 ¶ 13.

Later, in approximately October through November 2009, TCI brought a large number of new Ugandan guards to Al Asad to replace other guards who had been removed since June 2009. These new guards, as well as senior Ugandan guards who needed to complete their annual re-qualification, were all taken to the Small Arms Range ("SAR-2"). None of the Ugandan guards qualified. All of TCI's American Site Leads knew this. At the direction of a TCI supervisor, Al Asad Interim Deputy Site Manager J.O.[1] falsely certified the Firing Scorecard Sheets for each of those Ugandans, which records were then maintained in TCI's files to fraudulently demonstrate the guards were qualified. JA 012-013 ¶ 14.

During December 2009 and January 2010, the attrition and replacement of the Ugandan guards continued. On approximately January 15, 2010, TCI's Al Asad Site Manager J.C. directed Relator Badr and Acting Deputy Site Manager C.M. to compile a spreadsheet setting forth the purported qualification scores of

---

[1] Initials were used in Relator's Complaint to protect the identities of witnesses listed therein. Although it is no longer necessary to protect the identities of these individuals in light of the Government's Intervention Complaint, this factual rendition reflects the allegations as stated in the Complaint.

the guards for possible inspection by the Defense Contract Management Agency ("DCMA"), and internal tracking of guards who were approaching their annual re-qualification date.  JA 013 ¶ 15.

In May 2010, Al Asad Site Manager J.C. ordered that a group of approximately 40 Ugandan guards be re-qualified prior to departing for vacation, so that if DCMA later audited the Al Asad Contract when it was up for renewal in June 2010, the returning guards would be qualified for duty if TCI was re-awarded the Contract for the following year.  As was the case previously, all of the Ugandans who attempted to qualify (approximately 25 of the 40) at the target range failed.  Almost all of TCI's American Site Leaders were present at the range, and all were aware that none of the Ugandans had qualified.  JA 013 ¶ 16. That evening, Deputy Site Manager D.B. directed Relator Badr to provide him with the new qualification sheets for all of the Ugandans.  The sheets Relator Badr provided him were blank, as none of the Ugandan guards had qualified, and Relator Badr informed D.B. of that reason.  On approximately May 12, 2010, Relator Badr met in Herdon, Virginia with TCI Human Resources Director R.G. and Senior Legal Counsel J.P., and informed them that TCI's entire Ugandan Guard Force at Al Asad was unqualified to provide security, was in violation of TCI's contractual obligations to the U.S. Government, and that TCI's Al Asad managers were committing fraud and ordering others to do so in order to

cover up the situation.  JA 014 ¶ 17.  Approximately two days later, Relator Badr provided that same information by phone to TCI executive J.K.  JA 014 ¶ 18.

Upon returning to Al Asad on May 18, 2010, Relator Badr was instructed by a new Site Manager, D.B., to fill in the data for all of the Ugandans' Firing Scorecard Sheets.  Site Manger D.B. instructed him to falsely indicate that the men had obtained scores in the 30-31 range, with the women obtaining scores of 24-26. Following those instructions, Relator Badr did so over the next few days.  A new Site Manager, D.B.2., then signed the sheets, falsely post-dating them to indicate that the Ugandans had qualified in the following month of June.  JA 014 ¶ 19.

In June, TCI learned the Al Asad Contract had been awarded to another company.  Another range session was conducted for the Ugandan guards, whom TCI intended to transfer to other security contract sites in Iraq.  Again, none qualified. Site Lead/Range Safety Officer J.R. informed Site Manager D.B.2 of that fact.  JA 014-015 ¶ 20.  The Ugandans were then demobilized and transferred to other TCI Iraq contracts.  Approximately 30 were sent to the Cobra Contract; approximately 25 to the Kalsue Contract; some to the Delta Contract; with the majority of the remainder sent to the Basra Contract.  At the time TCI provided these Ugandans to fulfill those security contracts with the U.S. Government, none of them were qualified to provide such services.  JA 015 ¶ 21.

## SUMMARY OF ARGUMENT

The instant *qui tam* action concerns TCI's fraud against the United States by providing Ugandan guards at U.S. bases in Iraq who were completely unqualified to provide the protection to those bases for which the United States was paying TCI. TCI charged the U.S. Government for hundreds of Ugandans to purportedly protect U.S. military personnel on bases in Iraq, when TCI knew those guards did not know how to use their weapons, and could not even hit targets, much less meet the Government's minimum shooting requirements. To ensure that it would be paid for the security services it was not providing, TCI repeatedly falsified the guards' shooting scores. Even when TCI's senior managers in the U.S. were notified of the fraud, they did nothing to correct it.

Notwithstanding the district court's conclusion, the FCA does not require Badr to allege presentment of a particular invoice to the federal government. Rule 9(b) requires the relator to provide only the specifics of the fraudulent conduct, not the defendant's billing for that conduct. Badr's Complaint provides detailed descriptions of the individuals involved and the mechanics of their fraud for TCI. It is enough that he pleads generally that TCI engaged in that conduct to receive a financial benefit from the Government.

Further, Badr need not personally experience every aspect of the fraud he alleges. Moreover, Badr has met the heightened pleading requirement by averring actual knowledge, not speculation, of TCI's fraud at the U.S. military bases in Iraq.

Finally, the Government's intervention in the case does not supersede Badr's Count I, and it should not have been dismissed. The FCA gives him a continuing and potential future interest, and thus standing, in that claim. Instead, Count I should be held in abeyance until a final determination is made on the Government's Intervention Complaint Counts I and II that cover the same legal and factual conduct.

## ARGUMENT

### STANDARD OF REVIEW

Appellate review of a claim's dismissal under Rule 12(b)(6) is conducted *de novo,* as are questions of statutory interpretation. *Cioca v. Rumsfeld*, 720 F.3d 505, 508 (4th Cir. 2013); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

### DISCUSSION OF THE ISSUES

The district court's opinion erroneously required Relator Badr to specify in his Complaint actual falsehoods that were presented to the Government to induce payment. The opinion further mistakenly required that Badr have personally been present for, and have personal knowledge of, all of the facets of the fraudulent scheme he alleges. Nothing in the False Claims Act, or Rule 9(b), mandates such far-

reaching burdens upon relators. Indeed, neither of the FCA's relevant provisions, 31

U.S.C. § 3729(a)(1)(A) and (B), even requires that an actual false statement be

presented to the Government in exchange for payment, or that a relator have specific,

personal knowledge of all aspects of a defendant's conduct. As is pertinent to this

case, § 3729(a)(1)(A) requires only that a defendant have engaged in a fraudulent

course of conduct that results in a claim being made upon the Government; the claim

itself need not be facially false. Section 3729(a)(1)(B) imposes an FCA violation

when a defendant creates a false record for the purpose of influencing a claim made

upon the Government, regardless of whether the Government actually relies upon it.

Relator Badr's Complaint amply pleads both bases of FCA liability. Finally, the

district court erred in holding that Badr lacked standing to maintain Count I of his

Complaint in which the Government intervened, as intervention does not extinguish

the relator's ongoing and potential future rights in that claim.

## I.    The Pleading Standard for FCA Claims.

Under Fed. R. Civ. P. 8(a)(2), a plaintiff's complaint must make a "short and

plain statement of the claim." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007). The pleading of specific facts in support of a complaint is not necessary.

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Instead, a complaint need only give

the defendant "fair notice of what the . . . claim is and the grounds upon which it

rests." *Id*. Accordingly, "[t]o survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Because an FCA claim is a fraud claim, however, it is subject to the more stringent pleading requirements of Fed. R. Civ. P. 9(b). "To meet this standard, an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. These facts are often referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal citations omitted).

## II. The District Court Erred In Dismissing Badr's Complaint for Purportedly Failing to Meet Rule 9(b) Pleading Requirements for FCA Claims.

This case involves a relator who was personally involved and physically present during TCI's misconduct, and has inside information of its fraud. Precisely because he has that information, and contrary to the district court's casting of his allegations, Badr's Complaint meets the integrated requirements of Fed. R. Civ. P. 8(a) and 9(b). "Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not reflect a subscription of fact pleading

13

and requires only simple, concise, and direct allegations of the circumstances constituting fraud, which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185-86 (5th Cir. 2009) (internal citation and quotations omitted). Here, the Complaint provides a short and plain explanation of the broad circumstances in which TCI's fraud took place, and the details of the fraudulent conduct itself, including who did it, and how it was done.

Badr must plead each element of fraud with the required degree of specificity identifying "at a minimum . . . the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation . . ." *Wilson*, 525 F.3d at 379 (citing Rule 9(b)). Rule 9(b) serves four purposes: "First, the rule ensures that the defendant[s] ha[ve] sufficient information to formulate a defense by putting [them] on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation." *Harrison v. Westinghouse Savannah Riv. Co*., 176 F.3d 776, 784 (4th Cir. 1999) ("*Harrison I*"). Badr identified with specificity the persons engaged in the fraud, the dates and locations on which it occurred, the mechanisms of the fraud, its contents, and its rationale. JA 011-015 ¶¶ 6-21; 016 ¶ 26; 017 ¶¶ 30-31; 018 ¶¶ 37-38; 019-20

14

¶¶ 44-45; 021 ¶¶ 51-52.  Upon review of the aforementioned facts, TCI has sufficient notice with which to formulate a defense. Badr has significant pre-discovery inside information, and the Complaint's details make plain it is not brought frivolously or in bad faith.  Unfortunately, the district court's opinion imposed an additional requirement found in neither the FCA or Rule 9(b): That the relator's complaint specifically allege the presentment to the Government of a claim for payment that is facially false.  JA 236-239.

Moreover, contrary to the district court's holding, neither Rule 9(b), nor the FCA, require that Badr personally experience every aspect of the fraud he alleges. JA 238-39.  It is sufficient that Badr knows the Ugandans who were sent from Al Asad to other Iraqi bases were unqualified under the terms of the Contract; he need not have gone with them to know that. *See Harrison I*, 176 F.3d at 776.  Nor does the FCA require Badr to have personal knowledge of the billing procedures by which TCI received payment except to know that TCI used the guards in positions for which they were unqualified and then demanded payment from the Government for those guards.  Badr has done what Rule 9(b) requires: He has set forth the details of the fraudulent conduct for which TCI obtained payment.  It is the fraudulent conduct, that is, the material misrepresentation of fact, and not the method and nature of billing, to which Rule 9(b) is directed, and the district court's conclusions should be reversed.

15

A.    ISSUE 1: The District Court Erred in Holding Relator Badr's
Complaint Insufficiently States Causes of Action Under the FCA

Badr's Complaint sufficiently states causes of action under the FCA.  The

district court held otherwise on the grounds that Badr had failed to alleged specific

false claims that were actually presented to the Government for payment.  JA 236-

38.  While it is certainly true that a "false billing" is one way of violating the FCA,

it is by no means the only way.  Setting forth the specifics of a false billing is not

required under 31 U.S.C. § 3729(a)(1)(A) and (B).  Instead, all that the statute

requires are the specifics of a fraudulent scheme that were likely intended to result

in a false billing.  As the Court explained in *Harrison I*, a fraudulent course of

conduct in pursuit of government funds runs afoul of the statute:

> The phrase "false or fraudulent claim" in the False Claims Act should
> be construed broadly. The False Claims Act is "intended to reach all
> types of fraud, without qualification, that might result in financial loss
> to the Government.  The Court has consistently refused to accept a
> rigid, restrictive reading …." *United States v. Neifert-White Co.*, 390
> U.S. 228, 232 (1968) (citation and footnotes omitted). The False
> Claims Act "reaches beyond 'claims' which might be legally enforced,
> to all fraudulent attempts to cause the Government to pay out sums of
> money." *Id.* at 233. Thus, any time a false statement is made in a
> transaction involving a call on the Government fisc, False Claims Act
> liability may attach. The test for False Claims Act liability distilled
> from the statute and the sources discussed above is (1) whether there
> was a false statement or fraudulent course of conduct; (2) made or
> carried out with the requisite scienter; (3) that was material; and (4)
> that caused the government to pay out money or to forfeit moneys due
> (i.e., that involved a "claim").

16

176 F.3d at 788. Indeed, it was precisely to address this very misinterpretation adopted by the district court here – that FCA liability required presentment of a false claim to the federal government – that Congress amended the FCA in 2009. 1 John T. Boese, CIVIL FALSE CLAIMS & QUI TAM ACTIONS § 1.09 (4th ed. 2011). The "Fraud Enforcement & Recovery Act of 2009" ("FERA") amended FCA § 3729(a) to remove any requirement of an actual presentation of a claim to the federal government. Congress also amended § 3729(a)(2) to override the Supreme Court's decision in *Allison Engine v. United States ex rel. Sanders*, 553 U.S. 662 (2008), which had interpreted the FCA as limited to false statements or claims made for the purpose of getting the government to pay a claim.[2] *Id; see also United States ex rel. Wall v. Circle C Constr., LLC*, 697 F.3d 345, 355 n.3 (6th Cir. 2012) (observing 2009 FERA amendment of then-§ 3729(a)(2) [now § 3729(a)(1)(B)] to overrule *Allison Engine*).

### 1. FCA § 3729(a)(1)(B) Requires Only that a Relator Plead a False Statement that is Capable of Influencing a Government Payment, With No Requirement that it Actually Influence such a Payment.

Badr's Complaint readily sets forth a fraudulent scheme designed to influence a government payment in violation of FCA § 3729(a)(1)(B). The FCA's language provides that liability can attach to "any person who . . . knowingly

---

[2] What was previously 31 U.S.C. § 3729(a)(1) and (2) was amended and renumbered by FERA as 31 U.S.C. § 3729(a)(1)(A) and (B). *United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 306 n.7 (1st Cir. 2010).

17

makes, uses, or causes to be made or used, *a false record or statement material to a false or fraudulent claim*." 31 U.S.C. § 3729(a)(1)(B) (emphasis added).[3] "The term '*material*' means having a *natural tendency to influence, or be capable of influencing*, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (emphasis added); *see also Wilson*, 525 F.3d at 378 (citing materiality standard). Badr's Complaint does just that, repeatedly noting the incidents when TCI personnel falsified the Ugandan guards' qualification sheets ("a false record or statement") in order to falsely indicate to potential DCMA inspectors ("be capable of influencing") that TCI was providing the qualified security services to the government for which it was being paid despite not providing that service ("a false or fraudulent claim"). JA 012-013 ¶¶ 14-15; 014 ¶¶ 17-19.

Determining materiality is based on the "potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) ("*Harrison II*"). Here, the false qualification sheets, subject to DCMA audit, were intended to induce the Government to pay

---

[3] The "presentment of a claim" liability theory upon which the district court relied is in an entirely different subsection of the statute, currently found at § 3729(a)(1)(A) [formerly in § 3729(a)(1)], which imposes liability upon "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." As discussed in Part II.B.2, *infra*, the "specific invoice presentation" pleading requirement has long been discredited under that statutory subsection as well.

TCI funds it would otherwise not have paid at all, but for the fraudulent conduct masked by those records. As the *Grubbs* court observed in discussing the pre-FERA amendment form of 3729(a)(1)(B), "the recording of a false statement," "made with the requisite intent, is enough to satisfy the statute"—no presentment of a bill is required. 565 F.3d at 192-93 (citing *Allison Engine, Co.*, 553 U.S. at 671).

> **2.    FCA § 3729(a)(1)(A) Does Not Require a Relator's Complaint to Identify Specific Claims for Payment to the Government Under Rule 9(b), Only the Specifics of the Fraudulent Scheme that Likely Induced the Government to Make Such Payments.**

Contrary to the district court's assertion, identification of particular invoices submitted to the government is not necessary for an FCA claim. JA 236-239. Nothing in the FCA suggests that *qui tam* suits may be brought only by those who work in a defendant's billing department. If it were the case that only employees in the billing department could bring suit, in most instances those individuals would have no reason to know of the underlying fraud. As an employee on the front line of TCI's fraud in faking the guard qualifications, Badr had no reason to know the specifics of TCI's billings to the Government. All the FCA requires is that he plead the specifics of TCI's false conduct, not the specifics of how TCI received the funds resulting from that conduct. As the Fifth Circuit observed in *Grubbs*:

> Stating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme. A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone. Standing alone, raw bills-- even with numbers, dates, and amounts--are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work. It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

565 F.3d at 190 ("To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.").

The district court misapprehended Rule 9(b)'s application to the FCA. It is the fraudulent scheme, not the billing, that requires pleading specificity. Even the cases relying on the pre-FERA amendment version of the FCA consistently hold Rule 9(b) requires no 'specific invoice' averment. If the Complaint as a whole is sufficiently detailed to place Defendant on notice of the claims against it and to permit it to prepare a defense to those allegations, Rule 9(b) does not mandate individually specified claims for payment. *See Harrison I*, 176 F.3d at 784 (if a complaint informs defendant of the "particular circumstances for which she will have to prepare a defense at trial . . ." and that the "plaintiff has substantial prediscovery evidence of those facts," a court should hesitate to dismiss the

complaint pursuant to Rule 9(b)); *United States ex rel. Simpson v. Bayer Healthcare,* 732 F.3d 869, 876 (8th Cir. 2012) ("*claims for payment* subsequently submitted under a contract initially induced by fraud *do not have to be false or fraudulent in and of themselves* in order to state a cause of action under the FCA") (emphasis added); *United States ex rel. Ebeid v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010) ("use of representative examples [of false claims] is simply one means of meeting the pleading obligation"); *Lusby v. Rolls-Royce*, 570 F.3d 849, 854 (7th Cir. 2009) (it was not "essential . . . to produce invoices . . . at the outset of the suit" because the allegations as a whole supported the reasonable inference that defendant "must have submitted at least one" invoice or it "would not have been paid"); *Grubbs*, 565 F.3d 180 (5th Cir. 2009) (an FCA complaint need not specifically identify any false claim submitted to the government if the complaint's other allegations support a reasonable inference that false claims must have been submitted); *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 443 F.3d 1349, 1360 (11th Cir. 2005) (declining to dismiss *qui tam* suit under Rule 9(b) where relator nurse adequately alleged why she believed defendant submitted false claims, even though she provided no details of the claims actually submitted to the government).

21

The "how, or when, or why" of TCI's invoices are not the "central question" the Relator's Complaint must answer.  The *Grubbs* court cogently identified the central questions that Rule 9(b) expects an FCA complaint to respond to:

> Rule 9(b) also prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a "fishing expedition." A complaint that includes both particular details of a scheme to present fraudulent bills to the Government and allegations making it likely bills were actually submitted limits any "fishing" to a small pond that is either stocked or dead. Defendants either have or do not have evidence that the alleged phony services were actually provided; they either have or do not have evidence that recorded, but unprovided or unnecessary, services did not result in bills to the Government. Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations. That is the balance Rule 9(b) attempts to strike.

565 F.3d at 191.

In rejecting that argument, the district court erroneously cited to this Court's opinion in *United States ex rel. Nathan v. Takeda Pharmaceuticals*.  707 F.3d 451 (4th Cir. 2013).  *Takeda* stands for the uncontroversial premise that an FCA Relator must make "specific allegations" supporting the "plausible inference" that "false claims were presented *to the government*."  *Id.* at 457-58 (emphasis added). The *Takeda* relator alleged the defendant pharmaceutical company had caused the Government to be illegally charged for unlawful, off-label prescriptions.  *Id.* at 454.  However, his complaint failed to provide specific allegations plausibly suggesting that the claims were submitted to the government and not some other party—as opposed, for instance, to the recipients paying for the off-label drugs out

22

of their own pockets. *Id.* at 457-458, 460-61. The *Takeda* Court was doing no
more than holding that a complaint under the federal False Claims Act must be
directed to frauds against the *federal government*, and not just the possibility of a
fraud generally: "when a defendant's actions, as alleged and as reasonably inferred
from the allegations *could* have led, but *need not necessarily* have led, to the
submission of false claims, a relator must allege with particularity that specific
false claims actually were presented *to the government* for payment." *Id.*
(emphasis added). In fact, the *Takeda* Court cited approvingly to the Fifth
Circuit's opinion in *Grubbs*, observing that where the fraudulent conduct was
described with specificity, the fact that the Government had almost certainly been
falsely billed was sufficient to state an FCA claim. *Id.* at 457, citing *Grubbs*, 565
F.3d at 192.

The district court re-interpreted *Takeda* for the entirely different and
erroneous proposition that a Relator must always specify the actual piece of paper
submitted to the Government. JA 228, 236. But *Takeda* makes clear that such
specificity of payment exists only where the facts alleged leave open the question
of whether the Government has actually paid out on the fraud. Unlike in *Takeda*,
however, the instant Complaint leaves no question to whom the bills were
submitted: As the party contracting with TCI, the federal government is the only
plausible recipient and payor on TCI's false claims. Badr has not alleged any

claims that might not have been submitted to the government for payment. In fact, all claims arising from the fraudulent scheme in this case are specifically alleged to have been submitted to the government. JA 015 ¶ 21; 017-022 ¶¶ 29-56.

Similarly unavailing is the district court's reliance on *Glynn v. EDO Corp*, for the proposition that Badr "lacks personal knowledge of the requirements of [the Cobra, Kalsue, Basra, and Delta] contracts and thus did not plead any provisions of those contracts supporting a plausible inference that TCI failed to comply with those contracts" and that he otherwise lacks any "circumstantial evidence, such as personal experience" that might support his beliefs. JA 020, citing 710 F.3d 209, 217 (4th Cir. 2013). While conceding that *Glynn* holds that a relator need not have actual specific knowledge of the government contract that he believes is the subject of false claims, JA 237, the district court then concluded that Badr's belief in such fraud was not based on personal experience, but was merely a "presumption." JA 237-38. In so doing, the district court ignored the plain allegations of Badr's Complaint. Any logical reading of the Complaint taken as whole suggests TCI was paid for security services it did not provide on its Cobra, Kalsue, Delta, and Basra contracts using the same unqualified personnel it had used at Al Asad. JA 009-022. Indeed, the Complaint even alleges that TCI held another range session in June 2010 at which none of the Ugandans qualified *precisely* for the purpose of sending them to *other security sites* in Iraq, an exercise that would be unnecessary

24

if they were not being sent to other bases under contracts with similar contractual guard requirements. JA 014-015 ¶ 20. *Glynn* makes plain that Badr can assume the existence of similar security contracts at other Iraq sites based on his personal experience at Al Asad and the actions of his supervisors. 710 F.3d at 217.

The cases make clear that no invoices or specific contracts need be pleaded where Badr has more than adequately identified the who, what, when, where, and how of TCI's fraudulent course of conduct. That is all Rule 9(b) requires. It beggars the imagination to believe that TCI's Al Asad site managers would go through the charade of falsifying the Ugandans' qualification sheets if not to ensure that TCI would be paid by the Government for services it did not provide. *See Grubbs*, 565 F.2d at 192; *accord United States ex rel. Jajdelski v. Kaplan, Inc.*, 517 Fed. Appx. 534, 2013 U.S. App. LEXIS 2990 at *5 (9th Cir. Feb. 13, 2013) (unpublished opinion) ("It would stretch the imagination to believe that Kaplan employees fastidiously (and secretively) documented fake student enrollment statistics and met about them once the threshold for financial aid eligibility was crossed, only for the scheme to deviate at the last moment such that they did not submit those claims to the Department of Education" (internal punctuation omitted)). The likelihood that the scheme was directed to that purpose – making a false claim upon the Government to obtain money from it – is all that 31 U.S.C. § 3729(a)(1)(A) requires of a relator's complaint. *Id.*

25

**B.    ISSUE 2: The District Court Erred in Holding Relator Badr Needed Personal Knowledge of Every Fact Supporting Counts II-V Concerning Bases at Which He Was Not Personally Present.**

Relying on *United States ex rel. Carter v. Halliburton* ("*Carter II*")*,* the district court further asserted "nothing in Relator's Complaint establishes or creates a plausible inference that Relator was at the sites governed by these contracts and would thus have had personal knowledge of the alleged breaches at these sites [Cobra, Kalsue, Delta, and Basra]." JA 238, citing 2009 U.S. Dist. LEXIS 63649 at *27-28 (E.D.Va. July 23, 2009) (unpublished opinion).  The district court's opinion thus seeks to accomplish a requirement nowhere found under 9(b)'s requirement for FCA claims: That a relator have personally experienced every aspect of the fraud he alleges.

*Carter II* involved a relator who, on "information and belief," "believed" that the fraud he personally witnessed at his location also took place at the defendant's other locations in Iraq.  2009 U.S. Dist. LEXIS 63649 at *11.  By contrast, Badr does not claim to merely "believe" that unqualified guards were sent to other TCI bases in Iraq, he states it in the Complaint as fact:  "At the time Defendant TCI provided these Ugandans to fulfill security contracts [at the four bases] with the U.S. Government, none of them were qualified to provide such services. Defendant TCI was paid by the U.S. Government under terms similar to those under the Al Asad Contract."  JA 015 ¶ 21.  This Court made plain in

26

*Harrison I* that a relator's allegations must be taken as true. *See* 176 F.3d 776, 790-94 (1999). Badr's factual averments here must likewise be construed as true, and in the most favorable light to him.

Nor does the district court's attempt to analogize *Carter II* to Badr's claim withstand scrutiny. In *Carter II*, the relator was merely speculating what other people were doing at other places, but had no actual knowledge of their conduct. Here, Badr *knows* these guards were unqualified based on his observation of TCI's course of fraudulent conduct at Al Asad and that those same guards were still unqualified at the time they transferred to the post-Al Asad bases. By way of example, if the relator in *Carter II*, a water purification specialist, *knew* that the individuals on other bases who were being charged to the government as water purification specialists were, in fact, not such specialists, he would have had a viable FCA claim. *See* 2009 U.S. Dist. LEXIS 63649 at *4-5.

Having alleged the details of the Ugandans' unqualified status, where they were sent, and that TCI was paid in a manner similar to the Al Asad Contract, Badr has no pleading obligation to provide the evidentiary minutia underlying those allegations. *See Carter II*, 2009 U.S. Dist. LEXIS 63649 at *25-26, citing *Harrison I*, 176 F.3d at 784 (relator is not obligated to plead the evidentiary details of case prior to discovery; he needs only "plead the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation

27

and what he obtained thereby" to the "best of his ability and knowledge"). A defendant is not entitled at the pleading stage to know every detail or piece of evidence that will be offered against it. *See Hokama v. E.F. Hutton & Co.,* 566 F. Supp. 636, 645 (C.D. Cal. 1983) ("Rule 9(b) does not require or make legitimate the pleading of detailed evidentiary matter."); *Condor Am. v. American Power Development*, 128 F.R.D. 229, 232 (S.D. Ohio 1989) ("Plaintiff need only plead the circumstances of the fraud with particularity, not the evidence of the fraud.") (internal citations omitted). Fair notice, not detail, is what Rule 9(b) requires. *See Ballou v. General Electric Co.*, 393 F.2d 398, 399 (1st Cir. 1968).

Badr's Complaint alleges what he knows; discovery is the process by which TCI may ascertain the evidentiary bases for those allegations. "Rule 12(b)(6) motions to dismiss are not designed to weigh evidence or consider the truth or falsity of an adequately pled complaint." *Tal v. Hogan*, 453 F.3d 1244, 1265-66 (10th Cir. 2006) (holding that providing details of fraudulent scheme sufficient to withstand dismissal under Rule 9(b), regardless of defendant's view of those claims). Nothing prevents TCI from asking Badr what he saw, with whom he spoke, what documents he read, or with which policies he was familiar during discovery. Critiquing the Complaint for the extent of personal knowledge on Badr's part is an exercise to be conducted via summary judgment after discovery or at trial, but not at the pleadings stage.

III.    **ISSUE 3. The District Court Erred in Holding Relator Badr Lacks Standing Under the FCA to Participate in the Continued Litigation of Intervened Count I of His Complaint.**

Badr's Count I is virtually identical to the Government's Intervention

Complaint Counts I and II.  JA 015-016; 045-046.  Relying on that observation, the

district court ruled that Badr's Count I had been superseded, and that Badr therby

lost standing to pursue it.  JA 227 fn. 1, citing *United States ex rel. Feldman v. City*

*of New York*, 808 F. Supp. 2d 641, 648-49 (S.D.N.Y. 2011).  There appears to be

no appellate authority on this question. However, the district court's conclusion is

belied by the language and structure of the FCA itself, which gives relators a

continuing and future potential interest in intervened claims.

During the pendency of the case, and before a merits-based decision on the

intervened Counts is reached, nothing in the FCA suggests a relator forsakes the

ability to amend his own complaint in a way such that it could become factually

distinct from the Government's. *Cf. Rockwell Int'l Corp. v. United States*, 549 U.S.

457, 465 (2007) (observing that the Government and the Relator filed a joint

amended complaint, giving rise to the inference that they might do so separately).

The Government also maintains the right to dismiss its own intervened Counts,

which would not necessarily extinguish Relator's right to litigate his own. *Cf.*

*United States ex rel. Tahlor v. AHS Hosp. Corp.*, ___ F. Supp. 2d ___, 2013 U.S.

Dist. LEXIS 15226 at *12-14 (D.N.J. Oct. 31, 2013) (permitting relators to amend

29

their complaint after the Government had settled and dismissed its partial

intervention in the case). Nothing in the FCA's express language requires the

relator's claims be dismissed when the Government intervenes. Indeed, while the

Government has primary responsibility for the intervened Counts, the relator

maintains an independent right to participate in the litigation, and to object to a

proposed settlement.[4] *See* 31 U.S.C. § 3730(c).

The Government's intervention plainly does not extinguish all of a relator's

interests in the intervened count(s), or his theoretical right to litigate his identical

claim in the future if a final order is not entered on the Government's claim. *See,*

*e.g., Abrahams v. Kindred Healthcare, Inc.,* 2003 U.S. Dist. LEXIS 7163 at *2-3

(D.Del. April 28, 2003) (noting the Government's intervention and subsequent

withdrawal from an FCA case); *United States ex rel. Ortega v. Columbia*

---

[4] As one district court explained: "Congress was concerned not only that individuals ferret out and prosecute fraudulent claims on the government by themselves, but that individuals act as overseers of actions in which the government has joined. The Senate Report states that the statute is intended to 'allow[] the private individual who brought the false claims suit to take a more active role in the litigation if he chooses. . . Subsection (c)(1) provides *qui tam* plaintiffs with a more direct role not only in keeping abreast of the Government's efforts and protecting his financial stake, but also acting as a check that the Government does not neglect evidence, cause undue delay, or drop the false claims case without legitimate reason . . . Additionally, the person who brought the action may formally object to any motions to dismiss or proposed settlements between the Government and the defendant.'" *United States ex rel. Semtner v. Medical Consultants, Inc.,* 170 F.R.D. 490, 496 (W.D.Okla. 1997) (quoting S. Rep. 99-345 at 25-26, 1986 U.S.C.C.A.N. 5290-91).

*Healthcare,* 240 F. Supp. 2d 8, 11 (D.D.C. 2003) (same). Relator Badr's Count I

has not been "superseded" in the usual sense of the term, as he maintains both

ongoing and future potential interests in his claim.  Hence, the appropriate course

is to take no action on Relator's Count I while the Government litigates its own

matching Counts I and II, with Relator's Count I held in abeyance pending the

outcome of the Government's case.

## CONCLUSION

For the foregoing reasons Badr asks the Court to reinstate Badr's Counts I-V

and allow the matter to proceed in the District Court below.

## REQUEST FOR ORAL ARGUMENT
### (Local Rule 34(a))

Appellants/Relator Badr request oral argument because the district court's

erroneous analysis and conclusions concerning the FCA concern errors of law that

have been, and are likely to be repeated, and thus could benefit from maximum

clarification by the Court.  Given that this case presents facts at the core of

Congress's intent in enacting and amending the FCA, oral argument will likely

assist the Court in providing further clarity in this important area of law.

Respectfully submitted,
Omar Badr, Relator


BY:  /s/ Paul A. Prados
     Paul A. Prados (VSB # 71374)
     PPrados@dayjohns.com
     Earl "Trey" Mayfield (VSB # 41691)
     Milt C. Johns (VSB # 42305)
     Christopher M. Day (VSB # 37470)
     Day & Johns, PLLC
     10560 Main St., Ste. 218
     Fairfax, VA 22030
     (o) 703-268-5600
     (x) 703-268-5602
     *Attorneys for Relator Omar Badr*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
    32(a)(7)(B) because:

         this brief contains 7,846 words, excluding the parts of the brief
         exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.
    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

         this brief has been prepared in a proportional spaced typeface using
         Microsoft Word in 14 point Times New Roman.


                        /s/ Paul A. Prados
                        Paul A. Prados (VSB # 71374)

Dated: November 27, 2013

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on November 27, 2013, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following registered CM/ECF users:

Tara M. Lee, Esq.
Joseph C. Davis, Esq.
(for Jonathan D. King, Esq. & Paul D. Schmitt, Esq.)
DLA PIPER LLP (US)
11911 Freedom Drive, Suite 300
Reston, VA 20190

Charles W. Scarborough
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave, NW
Washington, DC  20530

Peter Hyun, Esq.
Assistant U.S. Attorney, E.D. Va.
OFFICE OF THE U.S. ATTORNEY
2100 Jameson Avenue
Alexandria, Virginia 22314

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219