RECORD NOS. 13-2190(L), CONS. W/13-2191

IN THE

# United States Court of Appeals
### FOR THE FOURTH CIRCUIT

No. 13-2190(L)

UNITED STATES OF AMERICA,

*Intervenor/Plaintiff - Appellant,*

and

UNITED STATES EX REL. OMAR BADR,

*Plaintiff,*

v.

TRIPLE CANOPY, INC.,

*Defendant - Appellee.*

### NO. 13-2191

UNITED STATES EX REL. OMAR BADR,

*Plaintiff - Appellant,*

v.

TRIPLE CANOPY, INC.,

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

### RESPONSE BRIEF OF APPELLEE
### TRIPLE CANOPY, INC.

Tara M. Lee
Joseph C. Davis
DLA PIPER LLP (US)
11911 Freedom Drive, Suite 300
Reston, Virginia 20190-5602
(703) 773-4000
tara.lee@dlapiper.com
joe.davis@dlapiper.com

Paul D. Schmitt
DLA PIPER LLP (US)
500 Eighth Street, N.W.
Washington, D.C. 20004
(202) 799-4524
paul.schmitt@dlapiper.com

*Counsel for Defendant - Appellee*
*Triple Canopy, Inc.*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2190__      Caption: __United States of America, et al. v. Triple Canopy, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Triple Canopy, Inc.__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

       Constellis Group, Inc.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                          ☐ YES ☑ NO
     If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Tara M. Lee                                Date:    October 9, 2013

Counsel for: Triple Canopy, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on    October 9, 2013    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see attached list of counsel.

s/ Tara M. Lee                                October 9, 2013
        (signature)                                    (date)

Mr. Michael David Granston
U. S. DEPARTMENT OF JUSTICE
Patrick Henry Building
950 Pennsylvania Avenue, NW
Washington, DC 20530

Judith Rabinowitz
U. S. DEPARTMENT OF JUSTICE
Room 9032
601 D Street, NW
Washington, DC 20004

Alan Gale
U. S. DEPARTMENT OF JUSTICE
Room 9032
601 D Street, NW
Washington, DC 20004

Peter Sangjin Hyun
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, VA 22314-5194

Milt C. Johns
DAY & JOHNS, PLLC
Suite 218
10560 Main Street
Fairfax, VA 22030

Christopher M. Day
DAY & JOHNS, PLLC
Suite 218
10560 Main Street
Fairfax, VA 22030

# <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURES

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ...........................................................iv

JURISDICTIONAL STATEMENT ..................................................1

STATEMENT OF ISSUES .............................................................2

STATEMENT OF FACTS ..............................................................3

I.    Facts Relevant To The Contract At Issue ...........................3

II.   The Government And Mr. Badr's Allegations......................6

III.  The District Court's Dismissal Of The Government And Mr. Badr's FCA Claims ...................................................9

SUMMARY OF ARGUMENT......................................................10

ARGUMENT................................................................................12

I.    The Government Did Not Sufficiently Plead A False Claim By Triple Canopy Related To Its Provision Of Guard Services At Al Asad ................................................12

    A.   The District Court Properly Concluded That Triple Canopy's Claims For Payment Were Not Factually False ......14

        1.   DD-250 Forms Cannot Be Used To Demonstrate A Claim For Payment Was False .................................15

        2.   Triple Canopy's Invoices Were Not Expressly False ................................................................18

    B.   The District Court Properly Concluded That Triple Canopy's Claims For Payment Were Not Impliedly False Or Fraudulent .................................................20

        1.   The District Court Properly Rejected The Government's Implied Certification Theory Because Triple Canopy's Invoices Did Not Include A Certification Of Compliance.....................................21

            a.   Implied Certification Liability Is Not Recognized In This Circuit .................................22

# TABLE OF CONTENTS
(continued)

**Page**

           b.     The Variant Of Implied Certification Liability Supported By The Government Is Unsupported By The Precedent Of This Court ........................................................................ 23

           c.     The Variant Of Implied Certification Liability Supported By The Government Is An Extreme Interpretation Of The Theory ......... 25

      2.    The District Court Properly Rejected The Government's Worthless Services Argument Because The Government Has Not Pleaded That The Guard Services Triple Canopy Provided At Al Asad Were The Equivalent Of No Performance At All ........................................................................ 30

      3.    The District Court Properly Rejected The Government's Defective Products Argument Because Such A Theory Is Unsupported By Precedent ...................................................................... 34

II.    The Government's False Records Claims Were Insufficiently Pleaded ................................................................................ 37

    A.    The District Court Properly Dismissed The False Records Claim Because The Government Could Not Demonstrate Double Falsity ........................................................ 37

    B.    The Government Failed To Plead Its False Records Claim With The Requisite Particularity .............................. 39

III.   Mr. Badr's First Count Was Properly Dismissed Because He Lacked Standing To Pursue It Upon The Government's Intervention ........................................................................ 45

IV.   Mr. Badr's Counts II-V Were Properly Dismissed Because They Were Not Pleaded With The Requisite Particularity .............. 48

    A.    Mr. Badr's Failure To Allege Presentment Was Fatal To His Non-Al Asad Counts ........................................ 49

-ii-

# **TABLE OF CONTENTS**
(continued)

**Page**

B.  Mr. Badr's Failure To Allege Any Specific Facts To Support His Non-Al Asad Counts Was Fatal To Those Claims ............................................................................52

CONCLUSION..........................................................................55

REQUEST FOR ORAL ARGUMENT......................................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) OF THE FEDERAL RULES OF APPELLATE PROCEDURE.....................58

CERTIFICATE OF FILING AND SERVICE ............................59

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allison Engine Co. v. United States ex rel. Sanders*,
   553 U.S. 662 (2008)........................................................................38

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................52

*Chesbrough v. Visiting Physicians Ass'n*,
   655 F.3d 461 (6th Cir. 2011) ....................................................27, 31

*Ebeid ex rel. United States v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ...........................................................27

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) .....................................................*passim*

*Hopper v. Solvay Pharm., Inc.*,
   588 F.3d 1318 (11th Cir. 2009) .................................................38, 43

*In re: Vencor, Inc. v. Kindred Healthcare, Inc.*,
   Nos. 99-3199(MFW), 99-3200(MFW), 99-3327(MFW),
   2003 WL 2004385 (D. Del. Apr. 28, 2003) .....................................46

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) ........................................26, 29, 30, 31

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007)........................................................................46

*Secretary of State for Defence v. Trimble Navigation Ltd.*,
   484 F.3d 700 (4th Cir. 2007) .............................................................8

*Sweeney v. ManorCare Health Servs., Inc.*,
   No. C03-5320RJB, 2005 WL 4030950 (W.D. Wash. March 4, 2005) ........32, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................3

-iv-

*United States ex rel. Allen v. Guidant Corp.*,
Civil No. 11-22, 2012 WL 878023 (D. Minn. March 14, 2012) ........................45

*United States ex rel. Barajas v. Northrop Corp.*,
147 F.3d 905 (9th Cir. 1998) ...............................................................................46

*United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.,*
104 F.3d 1453 (4th Cir. 1997) .............................................................................22

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
71 F.3d 321 (9th Cir. 1995) ..........................................................................15, 16

*United States ex rel. Carter v. Halliburton Co.*,
No. 1:08cv1162, 2009 WL 2240331 (E.D. Va., July 23, 2009).............15, 22, 54

*United States ex rel. Davis v. U.S. Training Ctr., Inc.*,
498 F. App'x 308 (4th Cir. 2012)........................................................30, 31, 34

*United States ex rel. DeCesare v. Americare In Home Nursing*,
757 F. Supp. 2d 573 (E.D. Va. 2010) ..................................................................38

*United States ex rel. Dekort v. Integrated Coast Guard Systems*,
705 F. Supp. 2d 519 (N.D. Tex. 2010) ................................................................16

*United States ex rel. Feldman v. City of New York*,
808 F. Supp. 2d 641 (S.D.N.Y. 2011) .....................................................38, 45, 47

*United States ex rel. Godfrey v. KBR, Inc.,*
360 F. App'x 407 (4th Cir. 2010)................................................................24, 29

*United States ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*,
No. 1:05cv1418, 2008 U.S. Dist. LEXIS 21957
(E.D. Va. March 13, 2008) ..................................................................................15

*United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*,
748 F. Supp. 2d 95 (W.D. Tex. 2010) ...........................................................38, 44

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .......................................................................43, 44, 50

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) ...............................................................................12

*United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) .............................................................44

*United States ex rel. Herrera v. Danka Office Imaging Co.*,
    91 F. App'x 862 (4th Cir. 2004) ...........................................21, 22, 24

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
    647 F.3d 377 (1st Cir. 2011).......................................................*passim*

*United States ex rel. Jones v. Collegiate Funding Services, Inc.*,
    469 F. App'x 244 (4th Cir. 2012) .......................................................11

*United States ex rel. Jones v. Collegiate Funding Servs., Inc.*,
    No. 3:07CV290, 2011 WL 129842 (E.D. Va. Jan. 12, 2011) ............41

*United States ex rel. Jordan v. Northrop Grumman Corp.*,
    No. CV 95-2985, 2002 WL 34251040 (C.D. Cal. Aug. 5, 2002) ......17

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
    575 F.3d 458 (5th Cir. 2009) .............................................................43

*United States ex rel. Main v. Oakland City Univ.*,
    426 F.3d 914 (7th Cir. 2005) .............................................................18

*United States ex rel. McLain v. Fluor Enterprises, Inc.*,
    Nos. 06–11229, 09–4191, 2013 WL 3899889 (E.D. La. July 29, 2013) ..........42

*United States ex rel. McLain v. KBR, Inc.*,
    No. 1:08-cv-499, 2013 WL 710900 (E.D. Va. Feb. 27, 2013)............22

*United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*,
    No. 1:09-cv-1086, 2011 WL 2182422 (E.D. Va. May 4, 2011) .........39

*United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*,
    707 F.3d 451 (4th Cir. 2013) ......................................................*passim*

*United States ex rel. Nowak v. Medtronic, Inc.*,
    1:08-cv-10368, 2011 WL 3208007 (D. Mass. July 27, 2011)............26

*United States ex rel. Ortega v. Columbia Healthcare, Inc.*,
    240 F. Supp. 2d 8 (D.D.C. 2003) ......................................................46

*United States ex rel. Owens v. First Kuwaiti Gen. Trading &
Contracting Co.*,
    612 F.3d 724 (4th Cir. 2010) ......................................................*passim*

*United States ex rel. Raggio v. Jacintoport Int'l LLC*,
    No. 10–01908 (BJR), 2013 WL 2462109 (D.D.C. June 7, 2013) .....................47

*United States ex rel. Robinson-Hill v. Nurses' Registry and
Home Health Corp.*,
    No. 5:08–145–KKC, 2012 WL 4598699 (E.D. Ky. Oct. 2, 2012).....................45

*United States ex rel. Roby v. Boeing Co.*,
    302 F.3d 637 (6th Cir. 2002) .....................................................35, 36

*United States ex rel. Roop v. Hypoguard USA, Inc.*,
    559 F.3d 818 (8th Cir. 2009) ..............................................................31

*United States ex rel. Sanchez-Smith v. AHS Tulsa Reg'l Med. Ctr., LLC*,
    754 F. Supp. 2d 1270 (N.D. Okla. 2010).......................................32, 33

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 2000)...........................................................24

*United States ex rel. Simpson v. Bayer Healthcare*,
    732 F.3d 869 (8th Cir. 2013) ..............................................................50

*United States ex rel. Steury v. Cardinal Health, Inc.*,
    625 F.3d 262 (5th Cir. 2010) ..............................................................41

*United States ex rel. Steury v. Cardinal Health, Inc.*,
    735 F.3d 202 (5th Cir. 2013) ..............................................................26

*United States ex rel. Swan v. Covenant Care, Inc.*,
    279 F. Supp. 2d 1212 (E.D. Cal. 2002) ..............................................32

*United States ex rel. Vigil v. Nelnet, Inc.*,
    639 F.3d 791 (8th Cir. 2011) ..............................................................26

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
    778 F. Supp. 2d 709 (N.D. Tex. 2011) ..............................................44

*United States ex rel. Wilkins v. United Health Group, Inc.*,
    659 F.3d 295 (3d Cir. 2011) ......................................................11, 26

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.*,
336 F.3d 375 (5th Cir. 2003) ...........................................................13

*United States ex rel. Wilson v. Kellogg Brown and Root, Inc.*
525 F.3d 370 (4th Cir. 2008) ....................................................*passim*

*United States ex rel. Yannacopoulos v. General Dynamics*,
652 F.3d 818 (7th Cir. 2011) ...........................................................26

*United States v. Bornstein*,
504 F.2d 368 (3rd Cir. 1974) ....................................................35, 36

*United States v. Bornstein*,
423 U.S. 303 (1976)...........................................................................35

*United States v. Dialysis Clinic, Inc.*,
No. 5:09-cv-00710, 2011 WL 167246 (N.D.N.Y. Jan. 19, 2011) .....................31

*United States v. Science Application Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010)......................................23, 25, 27, 30

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000)...........................................................................10

## STATUTES

31 U.S.C. 3729 *et seq.*.......................................................................3

31 U.S.C. 3729(a)(1)(A) ................................................................*passim*

31 U.S.C. 3729(a)(1)(B) ................................................................*passim*

31 U.S.C. 3729(a)(2) .........................................................................38

31 U.S.C. 3730(b)(4) .........................................................................47

31 U.S.C. 3730(c)(1).........................................................................46

31 U.S.C. 3730(c)(2)(A) ...................................................................47

31 U.S.C. 3730(d) .............................................................................46

Fraud Enforcement and Recovery Act of 2009 § 4(f), 123 Stat. 1625.............38, 39

**RULES**

Fed. R. Civ. P. 9(b) ..........................................................................*passim*

**OTHER AUTHORITIES**

Christopher Martin, *Reining in Lincoln's Law: A Call to Limit the Implied Certification Theory of Liability Under the False Claims Act*, 101 Cal. L. Rev. 227, 261 (2013) ........................................................................28

## JURISDICTIONAL STATEMENT

Defendant-Appellee Triple Canopy, Inc. ("Triple Canopy") agrees that this Court has jurisdiction for the purposes of this appeal.

## STATEMENT OF ISSUES

The Government and Mr. Badr allege that Triple Canopy submitted invoices to the Government for guard services that did not conform with one of the terms of Triple Canopy's contract with the Department of Defense. The Government and Mr. Badr also allege that on two occasions, Triple Canopy's employees generated records that falsely indicated guards had passed a weapons qualification test. The issues on appeal are:

1. In dismissing Count I of the Government's Complaint, did the District Court err in finding the Government had failed to properly allege a violation of 31 U.S.C. 3729(a)(1)(A)?

2. In dismissing Count II of the Government's Complaint, did the District Court err in finding the Government failed to properly allege a violation of 31 U.S.C. 3729(a)(1)(B)?

3. Did the District Court err in dismissing Count I of Mr. Badr's Complaint because the Government intervened on that count?

4. Did the District Court err in dismissing Counts II, III, IV, and V of Mr. Badr's Complaint because they were not pleaded with the particularity required for fraud-based claims by Rule 9(b) of the Federal Rules of Civil Procedure?

## STATEMENT OF FACTS

Triple Canopy, founded in 2003 by decorated veterans of the United States Army's Special Forces, provides mission support, security, and training services to the United States government and private clients throughout the world. J.A. 221. In 2007, the Department of Defense chose Triple Canopy to be one of several awardees of the Theatre-Wide Internal Security Services contract ("TWISS I"). Under TWISS I, the provision of security services at specific locations was governed by Task Orders. J.A. 27. From June 2009 to June 2010, Triple Canopy performed TWISS I Task Order 11 ("TO-11") at Al Asad Airbase in western Iraq. *Id*. Whether Triple Canopy's alleged failure to comply with one contractual provision of TO-11 violated the False Claims Act ("FCA"), 31 U.S.C. 3729 *et seq.*, is the gravamen of this action.

## I.   FACTS RELEVANT TO THE CONTRACT AT ISSUE

Under TO-11, Triple Canopy was tasked with providing "internal security services" at Al Asad Airbase, in order to "supplement and augment security operations" there.[1] J.A. 98. It was directed to do so "by providing internal operations at entry control points, internal roving patrols, and maintaining fixed-

---

[1] The Government referenced TO-11 extensively throughout its Complaint, and therefore Triple Canopy filed it as an exhibit to its reply in support of its Motion to Dismiss. J.A. 81-103. Accordingly, the District Court was entitled to properly consider TO-11 in ruling on Triple Canopy's motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Government agrees with this conclusion. Br. for Pl.-Appellant United States 6 n. 2 ("Int. Br.").

-3-

site security at selected locations at Al Asad Airbase." *Id.* Triple Canopy was to "prevent unauthorized access" by enforcing "security rules and regulations regarding authorized access to [Al Asad] including internal check points." *Id.*

Task Order 11 identified twenty itemized "responsibilities" Triple Canopy would have with regard to "supplement[ing] and augment[ing]" Al Asad's security operations. J.A. 99, 221. They included, among other things: "repel[ing] and control[ling] any unlawful or destructive activity directed toward the [base];" providing "escorts as required" between on-base locations; "searching vehicles and personnel entering and leaving [the base] to ensure only authorized personnel gain access;" "deny[ing] the introduction of contraband;" and "prevent[ing] theft." J.A. 99. These responsibilities went beyond just the provision of guards, and included: "provid[ing] an ammunition list of all contractor ordinance;" "accelerat[ing] enrollment of all personnel into an automated web-based system called SPOT;" and "ensur[ing] that all Third Country Nationals have cleared an INTERPOL, FBI, Country of Origin, or CIA background check, and have not been barred from any base by any commander in Iraq." The last of these twenty responsibilities was to "ensure that all employees have received initial training on the weapon that they carry, [and] that they have qualified on a US Army qualification course." J.A. 99.

-4-

TO-11 did not expressly or implicitly condition payment on compliance with any of these responsibilities. *See generally* J.A. 82-103.

Triple Canopy's Al Asad guard force had to meet a number of other general requirements listed elsewhere in TO-11. For instance, guards could not have "ever been convicted . . . of any crime against an Iraqi." J.A. 96. The contract also required, among other things, that each guard be: "fluent in English;" "familiar with the local geographical area and local customs;" and "compl[iant] with installation commander's dress code." J.A. 101.

During TO-11's period of performance, Triple Canopy presented twelve monthly invoices to the Government for payment. J.A. 41-42. Among other line items, each invoice identified the number of guards provided in the preceding month. *Id.* Neither TWISS I, TO-11, or the invoices themselves defined the term "guard." Triple Canopy did not submit any certifications with these invoices. J.A. 222.

Pursuant to the contract's terms, a contracting officer's representative ("COR") was "responsible for acceptance of the services [Triple Canopy] performed . . . ." J.A. 41. The Government appointed the COR, who for TO-11 was initially Marine Corps Captain Michael Reinke. J.A. 98. The COR memorialized his acceptance of Triple Canopy's services via a Material Inspection and Receiving Report, a DD-250 Form. J.A. 41, 57-80. Part 21(b) of that form

instructs the COR to sign and check a box for "ACCEPTANCE" of the services once they "conform to contract . . . ." *Id.* Part 22 of the DD-250 further requires the COR to sign the form if the services provided "were received in apparent good condition . . . ." *Id.* For TO-11, the Government's COR completed twelve DD-250 forms, signing and checking each one. J.A 57-80. None included a certification by Triple Canopy. *Id.* None were otherwise endorsed by Triple Canopy. *Id.*

## II.    THE GOVERNMENT AND MR. BADR'S ALLEGATIONS

On March 21, 2011, Omar Badr filed his Complaint with the District Court. J.A. 9. As a *qui tam* relator, Mr. Badr alleged that Triple Canopy violated the False Claims Act at Al Asad Airbase, where he had worked for Triple Canopy as a medic, and at four other locations, where he had never been deployed. J.A. 15-22. On June 25, 2012, the Government intervened on Count I of Mr. Badr's complaint, which alleged violations at Al Asad, and elected not to intervene on Mr. Badr's remaining counts, which alleged violations at the four other bases. J.A. 224, 227 n.10.

Mr. Badr and the Government allege that Triple Canopy's Al Asad guard force was not "qualified on a U.S. Army qualification course," and therefore violated that contractual provision of TO-11. J.A. 33 ("[Triple Canopy] presented claims knowing performance did not conform to TO 11 requirements."). Mr. Badr

-6-

and the Government contend that, on the basis of the guards' failure to properly "zero" their weapons in June 2009 shortly after their arrival at Al Asad, Triple Canopy's "on-site managers at FOB Al Asad knew" that none of the 332 Ugandan guards "demonstrated the ability to qualify on a U.S. Army qualification course." J.A. 33.

Mr. Badr and the Government claim that Triple Canopy's non-compliance with the weapons qualification contract term continued throughout the company's performance of TO-11. J.A. 223. They allege that on two separate occasions, guards at Al Asad failed to achieve a qualifying score after attempting a "record fire." J.A. 13, 35. They claim that shortly thereafter, Triple Canopy employees falsely indicated that the guards achieved a passing score on their "record fire scorecards." J.A. 13-14, 38. These scorecards memorialized whether a guard had qualified, and were stored in each guard's personnel file. J.A. 223. The scorecards created at Al Asad were not submitted to the Government. The Government does not allege otherwise. J.A. 31-32, 234, 243. In fact, the only COR "deliverables" identified in TO-11 were: (1) "[a] list of all weapons to be utilized by contractor personnel;" (2) "[a]n ammunition list of all contractor ordinance;" and (3) "[a] monthly report of fuel usage." J.A. 102. The scorecards were, however, to be "made available for COR inspection at any time." J.A. 32. Yet, neither the Government, nor Mr. Badr specifically alleges that the COR or any other

-7-

Government representative reviewed or inspected the allegedly fraudulent scorecards.  J.A. 234, 243.

In sum, the Government and Mr. Badr allege that Triple Canopy's Al Asad guard force was not properly weapons qualified, as required by one of TO-11's contractual terms.  They also allege that, on two occasions, Triple Canopy employees at Al Asad falsified guards' scorecards to indicate they had passed a weapons qualification attempt when they had not.  The Government and Mr. Badr, however, do not allege any of the following: (1) that Triple Canopy failed to comply with any other TO-11 contractual requirement; (2)  that Triple Canopy's twelve TO-11 invoices included or were accompanied by any express certifications of compliance with the allegedly violated contract term; (3) that Triple Canopy submitted the allegedly falsified scorecards to the Government or that they were reviewed by the Government at any time; or (4) that the allegedly falsified scorecards caused – in any way – the government to pay Triple Canopy's TO-11 invoices.[2]

---

[2] While, for the purposes of this appeal, Triple Canopy must accept the well-pleaded allegations in the Government and Mr. Badr's complaints, neither it nor the Court must accept their offered legal conclusions or suppositions.  *Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Therefore, it is not only relevant what the Government and Mr. Badr alleged, but also what they did not.

## III.  THE DISTRICT COURT'S DISMISSAL OF THE GOVERNMENT AND MR. BADR'S FCA CLAIMS

The Government's summary of the District Court's June 19, 2013 Opinion and Order dismissing its and Mr. Badr's FCA claims is incomplete.  It overlooks at least three additional bases critical to the District Court's ruling.  Int. Br. 9-16.

First, the District Court found that the Government's false records claim failed on the independent basis that its Complaint did not "demonstrate that the allegedly false weapons certifications were connected to a false claim."  J.A. 240. In so holding, the Court applied the "double falsity" rule, explaining that a properly pleaded Section 3729(a)(1)(A) false claim violation is the "*sine qua non*" of a properly pleaded Section 3729(a)(1)(B) false records violation.  J.A. 241.

Second, an additional reason for the dismissal of the Government's false record claim was its failure to adequately allege causation.  *See* J.A. 241 (finding lacking "causation between the allegedly falsified marksman records and any claims for payment . . . .").  Because causation is a required element of an adequately-pleaded false records claim, the Government's second count failed. J.A. 240-42.

Third, the District Court correctly applied the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure to the Government's FCA-related allegations. It reasoned that the Government's false records claim failed to

meet this burden because its Complaint did not plead with the requisite specificity how the Government relied on the allegedly falsified scorecards.  J.A. 241-42.

## SUMMARY OF ARGUMENT

The penalties imposed for violations of the False Claims Act are punitive. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 784-85 (2000) ("the current version of the FCA imposes damages that are essentially punitive in nature. . . ."). Accordingly, while this Court has expressed that "the phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly," it has cabined the FCA's application to instances where a contractor has made a claim for payment to the government that represents an objective lie by the contractor. *United States ex rel. Wilson v. Kellogg Brown and Root, Inc.* 525 F.3d 370, 378 (4th Cir. 2008) (rejecting FCA application where allegations are "devoid of any objective falsehood."). Such an interpretation is consistent with both the language of the statute and its general purpose. *See* 31 U.S.C. 3729(a)(1)(A) (where "false or fraudulent" modifies "claim for payment or approval"); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 726 (4th Cir. 2010) ("*Owens*") ("Congress crafted the FCA to deal with fraud, not ordinary contractual disputes.").

Given this interpretation of the metes and bounds of FCA liability, courts have relied on two general definitions for how a claim for payment can be "false or

fraudulent."   A claim can violate the FCA if it is "factually false," where it includes an objective falsehood on its face.  *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) ("A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government . . . .").  Alternatively, a claim can run afoul of the FCA if it is "legally false;" for instance, where it includes an express certification of compliance with a regulation, statute, or contractual provision.  *See United States ex rel. Jones v. Collegiate Funding Services, Inc.*, 469 F. App'x 244, 258 (4th Cir. 2012) (noting that the false certification theory "provid[es] the basis for all the allegedly submitted claims being legally 'false'. . . .").  Applying these theories does not undermine the FCA's purpose.  To the contrary, they provide a reliable standard by which to determine whether a plaintiff has properly alleged an "objective falsehood."

    The Government asks this Court to discard these interpretations of falsity that have been developed over decades of judicial interpretation.  Instead, it demands that violations of the FCA occur in every instance where a claim "request[s] payment for goods or services that do not satisfy all material conditions of payment."  Int. Br. 31.  Such an interpretation would expand the FCA's reach far beyond any application that this Court has ever endorsed, and would permit

-11-

exactly what it has previously warned against: turning every alleged breach of contract into an FCA violation. *Wilson*, 525 F.3d at 378; *Owens*, 612 F.3d at 727.

Triple Canopy provided a valuable service at Al Asad. During its period of performance there, the Government never indicated that it considered Triple Canopy's services to be substandard. If, now, the Government is dissatisfied with the adequacy of the Triple Canopy's Al Asad guard force, there are a number of avenues by which it can seek redress for those concerns. *Owens*, 612 F.3d at 727 (acknowledging the "contracting process" to address "contract disagreements"). But, the FCA's punitive damages provisions are not the appropriate remedy. Because Triple Canopy did not submit a false claim – either factually or legally – to the government for the services it provided at Al Asad, as the District Court correctly concluded, neither Mr. Badr nor the Government can allege any set of facts that permit the application of the FCA here. Mr. Badr and the Government's arguments to the contrary should be rejected, and the District Court's judgment should be affirmed.

**ARGUMENT**

## I. THE GOVERNMENT DID NOT SUFFICIENTLY PLEAD A FALSE CLAIM BY TRIPLE CANOPY RELATED TO ITS PROVISION OF GUARD SERVICES AT AL ASAD

To properly state a claimed violation of 31 U.S.C. 3729(a)(1)(A), a plaintiff must allege the presentation of a "false or fraudulent claim for payment." *United*

-12-

*States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) ("*Harrison II*"). The statement or conduct alleged by the plaintiff must include "an objective falsehood." *Wilson,* 525 F.3d at 376. Here, neither the Government nor Mr. Badr alleges any set of facts from which it can be concluded that Triple Canopy submitted a false claim for payment to the Government. Triple Canopy's TO-11 invoices were not "factually false" because they did not include any objectively false statement, and they were not "legally false" because they included no express or implied certification of compliance with any contractual term, regulation, or statute. *See United States ex rel. Willard v. Humana Health Plan of Texas Inc*., 336 F.3d 375, 381 (5th Cir. 2003) ("Because [relator] does not allege that any of the claims were false in the sense that they contained false statements or were for services not performed or the like, [relator] must resort to either the 'implied certification' or 'fraud in the inducement' theories of liability through which it may be possible to demonstrate that otherwise valid claims are actionable under the FCA.").

The Government tries to rescue its claimed violation of Section 3729(a)(1)(A) by distorting this Court's precedent, and suggesting it apply theories of liability it never has before. For the reasons explained below, these attempts fail. The only thing that the government has properly alleged is that Triple Canopy failed to comply with one of a number of the contractual requirements imposed by

-13-

TO-11.  This Court has never found that such a contract breach is sufficient to allege an FCA violation.  *Wilson*, 525 F.3d at 378 (falsity under the FCA "just as surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood . . . . To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract.").  It should not do so now.

### A.    The District Court Properly Concluded That Triple Canopy's Claims For Payment Were Not Factually False

To allege factual falsity, the Government must assert that the claims for payment Triple Canopy submitted represented an objectively false statement.  Yet the Government does not argue that the invoices were false in their representation of quantity, unit price, period of performance, or total amount.  Instead, relying on a new, expanded theory of "falsity," the Government presents a variety of possibilities as to how this Court might deem Triple Canopy's claims to be "expressly false or fraudulent."  Int. Br. 22-24.  These arguments – none of which is based on any authority – lack merit, because they do not satisfy the pleading requirement of an objective falsehood.

-14-

### 1.  DD-250 Forms Cannot Be Used To Demonstrate A Claim For Payment Was False

First, the Government asserts that the COR's DD-250s satisfy the falsehood standard.[3]  Int. Br. 22-23.  As an initial matter, numerous courts, including courts in this Circuit, have held that DD-250s, on their own, are insufficient to demonstrate a false claim.  This is because the form represents an affirmation by the Government – in this case, a Marine Corps captain – *not the contractor.*  *See United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 330 (9th Cir. 1995) (holding that, when not submitted as an invoice, a DD-250 form is not a "claim" under the FCA because "the government, not [defendant], certifie[s] on the form that the goods conform[] to contract."); *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162, 2009 WL 2240331, at *12 (E.D. Va., July 23, 2009) ("*Carter II*") (holding that a DD-250 form "does not constitute an express certification by the contractor of his compliance with the terms of the relevant contract," and therefore cannot, on its own, serve as a basis for a false claim); *see also United States ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*, No. 1:05cv1418, 2008 U.S. Dist. LEXIS 21957, at *11 (E.D. Va. March 13, 2008) (dismissing three FCA counts because they were "principally reliant upon the submission of the Form DD 250 which does not constitute false certification.").

---

[3]  As explained by the Ninth Circuit, "[a] DD-250 is a form supplied by the government which the contractor fills in, identifying the contract by number and

Perhaps recognizing that a DD-250 is a statement by the Government and not the contractor, the Government offers an alternative theory: that the DD-250s in this case "should properly be treated as express false representations made by TCI" because they "were *part* of the claims package TCI submitted to the Army each month . . . ." Int. Br. 23 (emphasis added).[4] This argument is a creative attempt to evade the aforementioned authority that a DD-250 cannot qualify as a false claim, and is itself unsupported by precedent. The only cases involving the use of DD-250s and a finding of falsity implicated circumstances not present here, such as the enclosure of a separate express certification accompanying the DD-250, or the use of the DD-250 as the sole invoice for payment. *See United States ex rel. Dekort v. Integrated Coast Guard Systems*, 705 F. Supp. 2d 519, 540 (N.D. Tex. 2010) (declining to dismiss false certification claim because DD-250 was accompanied by other certificates of compliance allegedly containing

---

providing a description of the item; the government then signs the form. The form has a variety of uses, and can be used as an invoice." *Butler*, 71 F.3d at 330.

[4] While the Government's brief claims that "each monthly invoice submitted by TCI attached a DD-250 form containing a certification by the COR that the listed items 'conform to contract,'" Int. Br. 22, the Government's Complaint makes no such specific allegation. Therefore, to support this claim in its brief, the Government cites to DD-250 forms attached to Triple Canopy's Motion to Dismiss in the District Court. *Id.* (*citing* J.A. 57, 59). However, there is nothing in the DD-250 forms referenced by the Government that establishes that they were included with Triple Canopy's invoices as "part of the claims package TCI submitted to the Army each month . . . ." Int. Br. 23. Accordingly, the Government cannot rely on them here to support its theory that the statements made by the COR on the DD-250s were somehow "adopted" by Triple Canopy.

misrepresentations); *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985, 2002 WL 34251040, at *7 (C.D. Cal. Aug. 5, 2002) (summary judgment denied in part because DD-250s were submitted as invoices, and therefore could have been considered false claims). There is no allegation by the Government that the DD-250s at issue here were used in such a fashion or were separately accompanied by documents containing an objective falsehood. Accordingly, the Government's reliance on the DD-250s to demonstrate falsity under Section 3729(a)(1)(A) fails.

Alternatively, the Government argues that "TCI's creation of false weapons scorecards 'caused' CORs to make false statements and generate false records certifying TCI's compliance with contractual terms, and TCI then 'used' those false statements and records (attaching DD-250s to its invoices) to ensure the payment to its claims." Int. Br. 23. Putting aside the fact that the alleged creation of false scorecards is not relevant to a false claim under Section 3729(a)(1)(A),[5] the Government's theory overstates the allegations pleaded in its Complaint. As discussed in Argument Section II.B., *infra*, the District Court rightly found that nowhere in that Complaint did the Government plead with specificity that the COR reviewed scorecards or relied on them in completing the DD-250s. J.A. 239-42.

---

[5] In the very next sentence of its argument, which pertains to a purported false claim under Section 3729(a)(1)(A), the Government cites Section 3729(a)(1)(B), which pertains to a false record claim.

-17-

Absent such allegations of reliance, the Government cannot now claim that the allegedly falsified scorecards "caused" the COR "to make false statements and generate false records."  Int. Br. 23.  Indeed, the only authority cited by the Government in support of this novel theory emphasizes the need for a causal link between a false statement and improper payment.  *See United States ex rel. Main v. Oakland City Univ*., 426 F.3d 914, 916 (7th Cir. 2005) (stating that the FCA "requires a *causal* rather than a temporal connection between fraud and payment" and allowing for liability under the FCA "[i]f a false statement is integral to a *causal chain* leading to payment . . . .") (emphasis added).  The Government's attempt to base an allegation of objective falsity on the COR's DD-250s is therefore misplaced.

## 2.    Triple Canopy's Invoices Were Not Expressly False

The Government's second factual falsity argument is also spurious.  Because, the Government claims, TO-11 required employees who carried firearms to pass a qualification test, and some guards allegedly did not, the invoices' "characterization of the services provided by these individuals as 'guard' services was plainly false or fraudulent . . . ."  Int. Br. 23.  In other words, the Government argues that the guards were somehow not guards at all despite the year of guard services they successfully provided.  Yet nowhere in TO-11, or TWISS I, or Triple Canopy's invoices is there any definition of "guard."  Absent such a definition,

-18-

there is no measurable standard by which the Government can plausibly claim that Triple Canopy's use of the word "guards" in its invoices was false or fraudulent. *See Wilson*, 525 F.3d at 376.

Moreover, the Government cites only one aspect of TO-11 purportedly breached by Triple Canopy – the weapons qualifications clause. However, TO-11 tasked the guards with far more than simply completing a weapons qualifications test. These responsibilities included escorting personnel, searching vehicles and personnel entering and leaving the base, and being fluent in English. J.A. 99, 101. The Government does not dispute that these other services were provided. Nor does the Government anywhere allege that Triple Canopy's guards failed in their duty to "repel and control any unlawful or destructive activity" directed toward the base, or for that matter any other duties as required by TO-11. J.A. 99. Insisting that the guards purportedly lacked weapons qualifications does not nullify the numerous other services Triple Canopy's guards successfully provided at Al Asad.[6] No interpretation of the Complaint's allegations regarding Triple Canopy's non-compliance with TO-11's weapons qualifications term can be taken to mean that the invoices' use of the term "guards" was objectively false. The Government's attempt to manufacture any inference of falsehood lacks merit.

---

[6] As discussed in Argument Section I.B.2, *infra*, given that the contract called for numerous services from the guards, allegations that some or all of the guards lacked weapons qualifications at various times cannot render those services "worthless," and therefore false under the FCA.

-19-

**B.    The District Court Properly Concluded That Triple Canopy's Claims For Payment Were Not Impliedly False Or Fraudulent**

Neither the Government nor Mr. Badr can allege that Triple Canopy's TO-11 invoices, its "claims for payment," were objectively false.  *See* Argument Section I(A), *supra*.  Accordingly, the Government also argues that the District Court erred by holding that it had not properly alleged that Triple Canopy's invoices were "impliedly false."  Int. Br. 24-38.  In support, the Government now claims that all that is necessary to violate the FCA is seeking "payment for services that [Triple Canopy] knew did not satisfy a material condition of payment."  Int. Br. 24.  And it lambasts the District Court for making the "most serious error" of "insist[ing] that the government's claims be analyzed solely through the narrow lens of categories and theories that some courts have employed to describe how claims for payment that contain nothing false on their face may nevertheless be 'false'. . . ."  Int. Br. 31.

What the Government overlooks is that the application of such "theories," developed through precedent, is exactly how courts have – for decades – interpreted FCA liability based on allegations of implied falsity.  In fact, the Government exposes as contrived its derision for such analysis when, later in its Opening Brief, it argues for *the application of those very same theories it condemns the District Court for considering*.  As it did in the proceedings below, the Government argues that not only is Triple Canopy liable under the theory of

-20-

"implied certification," (Int. Br. 34-38) but also under the theories of "worthless services" (Int. Br. 33-34) and "defective products" (Int. Br. 31-33). Accordingly, the Government's true grievance is not with the District Court's consideration of these theories, but rather the conclusion at which it arrived after doing so. As the District Court correctly found, none of these theories of liability are applicable here. Its ruling should not be disturbed.

> **1.    The District Court Properly Rejected The Government's Implied Certification Theory Because Triple Canopy's Invoices Did Not Include A Certification Of Compliance**

Implied certification, as a theory of FCA liability, is not recognized in the Fourth Circuit. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786-87 n. 8 (4th Cir. 1999) ("*Harrison I*") (finding the viability of "an implied certification claim in the Fourth Circuit" to be "questionable"); *United States ex rel. Herrera v. Danka Office Imaging Co.*, 91 F. App'x 862, 864 n.3 (4th Cir. 2004) ("*Herrera*"). Despite this, the Government demands that this Court adopt implied certification, for the first time, and apply it to the facts of this case. In doing so, the Government disregards the Fourth Circuit's previous discussion of this theory of liability and fails to disclose that the variant of implied certification for which it advocates aligns with only the most extreme version applied by those other Courts of Appeal that have adopted it. In short, the Government argues that not only should this Court break with its own precedent and acknowledge implied

-21-

certification, but also that it should apply the theory in such a way that would make it an outlier from those Circuits that have accepted it.  Because the Government's theory is out of step with both the case law of this Court and that of the Circuits that have acknowledged implied certification, it should be rejected.

### a.    Implied Certification Liability Is Not Recognized In This Circuit

Previously, the Fourth Circuit has held that "[t]here can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information."  *United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.,* 104 F.3d 1453, 1461 (4th Cir. 1997).  On the basis of this precedent, in *Harrison I*, this Court found "an implied certification claim in the Fourth Circuit" was "questionable."  176 F.3d at 786-87 n.8.  Since *Harrison I*, the Court has not retreated from this conclusion.  *See, e.g.*, *Herrera*, 91 F. App'x at 864 n.3 ("We have previously noted that claims of implied certification were 'questionable' in this circuit.").  And, relying on *Harrison I*'s application, district courts throughout this Circuit have concluded that implied certification is not viable here.  *See, e.g., Carter II,* 2009 WL 2240331, at *13 (dismissing implied certification claim and noting that "[n]othing in Relator's argument convinces this Court that the Fourth Circuit would choose to recognize an implied false certification claim…"); *United States ex rel. McLain v. KBR, Inc.*, No. 1:08-cv-499 (GBL/TCB), 2013 WL

-22-

710900, at *6 (E.D. Va. Feb. 27, 2013) ("The Fourth Circuit has not adopted th[e] [implied false certification] theory.").

Because implied certification has not been accepted in this Circuit, the Government's argument that Triple Canopy violated the FCA on that basis necessarily fails.  Moreover, while the Government demands this Court apply the variant of that theory adopted by the First and D.C. Circuits, such an interpretation is unsupported by this Court's precedent.

> **b.      The Variant Of Implied Certification Liability Supported By The Government Is Unsupported By The Precedent Of This Court**

The Government asks this Court to adopt the version of implied certification liability applied by the D.C. Circuit in *United States v. Science Application Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ("*SAIC*") and the First Circuit in *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011) ("*Hutcheson*").    Int. Br. 27, 36-37.   In *SAIC*, the D.C. Circuit found that to establish liability, the FCA plaintiff need only establish that the defendant "withheld information about its noncompliance with material contractual requirements."  626 F.3d at 1269.  In *Hutcheson*, the First Circuit applied a similar interpretation, finding implied certification claims may reach any undisclosed violation of a contractual, statutory, or regulatory provision material to the Government's payment decision.  647 F.3d at 388.

-23-

While this Court has never adopted implied certification, its previous discussion of the theory has left little doubt that were it to no longer question its application, such a claim would only be viable where compliance with the allegedly violated contractual term, statute, or regulation was an express precondition of payment. As *Harrison I* explained, "[t]o the extent that Harrison is asserting an implied certification by silence . . . Harrison's claim fails on the pleadings because he has never asserted that such implied certifications were in any way related to, *let alone prerequisites for*, receiving continued funding." 176 F.3d at 793 (emphasis added). This articulation was reiterated in *Herrera*, which reasoned, "Courts that 'have been ready to infer certification from silence' require the relator to at least show 'certification was a prerequisite to the government action sought.'" 91 F. App'x at 864-65 (citing *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000) and finding "the BPA at issue here does not condition payment of Danka's invoices on a certification that Danka will remit the FFS" and, therefore, "Herrera's theory of implied certification fails as well . . . ."). Subsequent opinions support this view. *See United States ex rel. Godfrey v. KBR, Inc.,* 360 F. App'x 407, 412 (4th Cir. 2010) (finding that the allegations of "any express or implied certification" failed because "*Godfrey* did not allege that LOGCAP, the contract between KBR and the government, made payment contingent on compliance with any particular

-24-

conditions . . . ."). The version of implied certification that the Government now demands the Court adopt is unsupported by this line of authority because it does not require that payment be expressly conditioned on the contractual term allegedly violated.

Because it is far broader than any articulation of the theory previously considered by this Circuit, there is no basis for this Court to adopt the extreme version of the theory the Government endorses. In fact, the articulation of the implied certification theory propounded by the Government is also out of step with that interpretation applied by a number of the other Courts of Appeal that do recognize it.

### c.    The Variant Of Implied Certification Liability Supported By The Government Is An Extreme Interpretation Of The Theory

Read in a vacuum, the Government's Opening Brief would suggest that the only viable theory of implied certification is that expressed in *SAIC* and *Blackstone*. *See* Int. Br. 35 (arguing that "[m]any courts of appeals have endorsed some variant of the implied certification theory of FCA liability. . . ." and citing opinions from the Third, Ninth, Sixth, Second, Tenth, and D.C. Circuits, but failing to describe how those circuits have applied the theory in practice). But that is far from the case. Of those Circuits that have adopted implied certification, *SAIC* and

*Blackstone* articulate the most extreme variation of the theory.[7]  *See United States ex rel. Nowak v. Medtronic, Inc.*, 1:08-cv-10368, 2011 WL 3208007, at *28 (D. Mass. July 27, 2011) (noting that *Hutcheson* "departed from the holdings of many of its sister circuits . . . .").

At least four circuits – a plurality of those that accept some form of implied certification theory – have found that submission of a claim creates an implied certification of compliance with contract provisions, statutes, or regulations only when payment is expressly conditioned on them.  *Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) ("implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid"); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 309 (3d Cir. 2011) ("to plead a claim upon which relief could be granted under a false certification theory, either express or implied, a plaintiff must show that compliance with the regulation which the

---

[7] Three circuits, in addition to this one, have not yet recognized any implied certification theory of liability.  *See United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 205 (5th Cir. 2013) (explaining that "the Fifth Circuit has not yet adopted the implied false certification theory of FCA liability . . . ." and that "any such claim (whether express or implied) must assert that a certification was a 'prerequisite' to the payment sought . . . ."); *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 824 n.4 (7th Cir. 2011) (violations of laws, rules, or regulations do not support a claim under the FCA, unless certification of compliance is a prerequisite for obtaining a government benefit); *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 795 (8th Cir. 2011) (noting that "[t]he FCA is not concerned with regulatory noncompliance.").

defendant allegedly violated was a condition of payment from the Government");
*Chesbrough v. Visiting Physicians Ass'n*, 655 F.3d 461, 468, (6th Cir. 2011)
("Under [the implied certification] theory, it is not the violation of a regulation
itself that creates a cause of action under the FCA.  Rather, noncompliance
constitutes actionable fraud only when compliance is a prerequisite to obtaining
payment.  Thus, a relator cannot merely allege that a defendant violated a standard
– he or she must allege that compliance with the standard was required to obtain
payment."); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.
2010) ("Under both [express and implied certification] theories, '[i]t is the false
certification of compliance which creates liability when certification is a
prerequisite to obtaining a government benefit.' Likewise, materiality is satisfied
under both theories only where compliance is 'a *sine qua non* of receipt of state
funding.'") (citations omitted).

        This interpretation of implied certification is far more reasonable than that
endorsed by *SAIC* and *Hutcheson*.  By finding that implied certification claims
reach any undisclosed violation of a contractual, statutory, or regulatory provision
material to or "capable of influencing" the Government's payment decision, the
First and D.C. Circuits have endorsed a theory of liability that potentially turns any
breach of contract into an FCA violation.  Such a theory directly undermines the
purpose of the Act.  As this Court has previously explained:

-27-

> Congress crafted the FCA to deal with fraud, not ordinary contractual disputes. The FCA plays an important role in safeguarding the integrity of federal contracting, administering strong medicine in situations where strong remedies are needed. Allowing it to be used in run-of-the-mill contract disagreements and employee grievances would burden, not help, the contracting process, thereby driving up costs for the government and, by extension, the American public.

*Owens*, 612 F.3d at 726-27. The express-condition-of-payment implied certification theory is more aligned with this interpretation of the FCA's purpose. Such an application permits the administration of "strong medicine" in instances where a contractor has submitted a false or fraudulent claim for payment for the purpose of causing the Government to pay out money. It still permits liability to arise in instances where: "(1) the government would not have paid the claim (because it is barred from doing so) and (2) the contractor knows or should know that the government would not pay the claim (because the contract, statute, or regulation contains express language to this effect, putting the contractor on notice)."[8] Yet, as this Court has warned against, such an outcome does not undermine the government contracting administrative process by applying FCA liability to every potential breach of contract.

---

[8] Christopher Martin, *Reining in Lincoln's Law: A Call to Limit the Implied Certification Theory of Liability Under the False Claims Act*, 101 Cal. L. Rev. 227, 261 (2013).

-28-

Here, the Government does not advocate that this Circuit adopt the express-condition-of-payment theory of implied certification. This is unsurprising. Under this implied certification theory, the Government would have no FCA claim here; it has not – and cannot – allege that any contractual term, statute, or regulation expressly conditioned payment to Triple Canopy under TO-11 on the weapons qualification status of its Al Asad guards.[9]  J.A. 235 ("[T]he absence of a precondition for payment connected to the weapons qualification certification forms undermines any implied certification liability here.")  All the Government is able to allege is that Triple Canopy's Al Asad guard force was purportedly not compliant with one of the many contractual terms imposed by TO-11. *See* Statement of Facts Section II, *supra.*  So, instead, it argues that the Court adopt the

_____

[9] The Government attempts to undermine this fact by arguing it "specifically alleged that payment on the contract was conditioned on compliance with the weapons-proficiency requirements in TO-11 and that its CORs would not have signed the DD-250s certifying that TCI had performed its obligations if they had known the true state of affairs." Int. Br. 37.  This argument is a red herring.  As explained, under this articulation of the implied certification theory, compliance as a condition of payment must be *expressly* stated in the underlying regulation or contractual agreement.  *See Mikes*, 274 F.3d at 700 (plaintiff must allege that the underlying requirement "expressly states the provider must comply in order to be paid"); *Godfrey*, 360 F. App'x at 412 (certification claim fails because "[Relator] did not allege *that LOGCAP, the contract between KBR and the government*, made payment contingent on compliance with any particular conditions") (emphasis added).  Just as was the case in *Godfrey*, the government has not alleged that TO-11 "the contract between [Triple Canopy] and the government, made payment contingent on compliance with [the guards being weapons qualified]." *Id.*  Therefore, the fact that the government claims that had it "known that the guards were not qualified," it "would not have paid [Triple Canopy] for the amounts billed for the guards" is of no consequence.  J.A. 44.

-29-

more extreme – and more amorphous – interpretation of the theory endorsed by *SAIC* and *Hutcheson*. But, this variant of implied certification is unsupported by the precedent of this Circuit and divergent from that applied by a number of other Circuit Courts that do accept the theory. The Court should not disregard its precedent and the reasoned analysis of other Courts of Appeal on this issue simply because the Government is unable to allege facts which give rise to a viable theory of FCA liability against Triple Canopy.

> **2.   The District Court Properly Rejected The Government's Worthless Services Argument Because The Government Has Not Pleaded That The Guard Services Triple Canopy Provided At Al Asad Were The Equivalent Of No Performance At All**

As an alternative to implied certification, the Government contends that FCA liability arises under application of the "worthless services" theory. Below, the District Court properly rejected this line of reasoning because the facts alleged do not support a finding that the services provided at Al Asad were the equivalent of no performance at all. J.A. 232.

"In a worthless services claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *United States ex rel. Davis v. U.S. Training Ctr., Inc*., 498 F. App'x 308, 315 n. 11 (4th Cir. 2012) (quoting *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001)). First recognized by the Second Circuit in *Mikes v. Straus*, such a claim, which typically

arises in the medical services industry, "is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided." 274 F.3d at 703. There, imposing the equivalent-of-no-performance-at-all standard, the Second Circuit rejected the plaintiff's worthless services theory because defendants had "a good faith belief that [the services provided] were of medical value." *Id.* at 704. Following *Mikes*, other courts that have considered the application of the worthless services theory have similarly found that it is only satisfied when the services provided were so devoid of worth that they were "the equivalent of no performance at all." *See, e.g., U.S. Training Ctr., Inc*., 498 F. App'x at 315 n. 11; *Chesbrough,* 655 F.3d at 468 (reasoning that "[a] test known to be of 'no medical value,' that is billed to the government would constitute a claim for 'worthless services,' because the test is so deficient that for all practical purposes it is the equivalent of no performance at all," and suggesting that services that were just "poor [in] quality" would not support such a claim) (quotations omitted); *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009) (rejecting a worthless services claim because plaintiff had only alleged that defendant's product, when misused, resulted in "serious adverse consequences," not that the service was so deficient to be "equivalent to no performance at all"); *United States v. Dialysis Clinic, Inc.*, No. 5:09-cv-00710, 2011 WL 167246, at *21 (N.D.N.Y. Jan. 19, 2011) (rejecting a worthless services

claim because plaintiff challenged only the "quality of care" provided by defendant's services, not that defendant failed to provide any services to their patients); *United States ex rel. Swan v. Covenant Care, Inc.*, 279 F. Supp. 2d 1212 (E.D. Cal. 2002) (no worthless services claim because "[plaintiff] does not allege that [defendant's] neglect of its patients was so severe that, for all practical purposes, the patients were receiving no room and board services or routine care at all, [plaintiff's] FCA claim does not fit within the worthless services category"); *Sweeney v. ManorCare Health Servs., Inc.*, No. C03-5320RJB, 2005 WL 4030950, at *6 (W.D. Wash. March 4, 2005) (rejecting a worthless services claim because plaintiff only alleged that defendant healthcare provider failed to provide one of a number of bundled services billed to the government and therefore did not allege that the defendant failed to provide any services at all); *United States ex rel. Sanchez-Smith v. AHS Tulsa Reg'l Med. Ctr., LLC*, 754 F. Supp. 2d 1270, 1287 (N.D. Okla. 2010) (no worthless services claim because, while medical care may have been substandard, nevertheless some care was provided).

Here, the Government did not – and cannot – allege that the guard services Triple Canopy provided at Al Asad Airbase were so devoid of worth that they were the equivalent of no performance at all. Under the explicit terms of TO-11, the services Triple Canopy was directed to provide included far more than confirmation that its guard force was weapons qualified. The guards'

-32-

responsibilities encompassed "repel[ing] and control[ing] any unlawful or destructive activity directed towards" the base, serving as "escorts," "searching vehicles and personnel entering and leaving [Al Asad] to ensure only authorized personnel gain access," acting as "security liaisons," and being "fluent in English" and "familiar with the local geographical area and local customs." J.A. 99, 101; Statement of Facts Section I, *supra*. In order to find that the guard services Triple Canopy provided at Al Asad were worthless, the Government would have to allege that all of these other requirements went unprovided or were devoid of all value. *See Sweeney*, 2005 WL 4030950, at *6 ("it would be impossible to determine whether particular services [defendant] provided, and the United States paid for, were worthless without finding that the care as a whole was worthless."). Yet the Government's Complaint does not suggest that the guards failed to meet these other contractual requirements, a fact the Government conceded when it confirmed that it had not alleged "that [any guard] never showed up on the job," or that "some guard who was there didn't perform their duties in terms of patrolling the perimeter or searching people going in and off the base . . . ." J.A. 126-27. To allow worthless services claims to proceed, as the Government suggests, whenever the services "provided were not 'in full compliance with the terms of the contract'" would undermine the purposes of the FCA by allowing its punitive damages provisions to be applied whenever a contract is breached. *Owens*, 612 F.3d at 726;

-33-

*see also Sanchez-Smith*, 754 F. Supp. 2d at 1288 (permitting a worthless services claim to proceed where the overall "bundled" services were not alleged to be deficient "would stretch FCA 'factual' falsity liability too far beyond its intended purpose of preventing misrepresentations of fact on claim forms").

In short, because the Government has alleged that only one of the many services Triple Canopy provided at Al Asad may have been deficient, the District Court correctly rejected the Government's worthless services theory because it "fails to sufficiently allege that the guards' services were entirely devoid of value or that the noncompliance with the weapons qualification requirement caused any injury to the Government such that the guards effectively provided no service at all." J.A. 232.

### 3.    The District Court Properly Rejected The Government's Defective Products Argument Because Such A Theory Is Unsupported By Precedent

As an offshoot of its "worthless services" theory, the Government claims that the District Court erred by rejecting the Government's "defective products" argument.  Int. Br. 31-33.  At the outset, this claim is unavailing on its face; by its very title, a "defective product" is not "equivalent of no performance at all."  *U.S. Training Ctr., Inc.*, 498 F. App'x at 315 n.11.  More specifically, however, the District Court committed no error in rejecting the Government's "defective

products" theory because the case law offered by the Government does not support the recognition of such a theory.

To support the application of its "defective products" theory, the Government relies on *United States v. Bornstein*, 423 U.S. 303 (1976), and *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637 (6th Cir. 2002). It claims that these cases support the "basic principle that claims are 'false' where they request payment for goods or services that do not satisfy all material conditions of payment. . . ." Int. Br. 31. They endorse no such thing. FCA liability was not based solely on the provision of a defective product in either action. For instance, while the Supreme Court's opinion in *Bornstein* explained that "each invoice included claims for payment for the falsely marked tubes," this information was offered only as background; the Court did not address the issue of whether FCA liability arose from the transaction but instead limited its review to "whether the subcontractor should be liable for each claim submitted by its prime contractor." *Bornstein*, 423 U.S. at 309. Rather, the FCA violations in *Bornstein* were the result of the submission of an inaccurate *express certification*. *See United States v. Bornstein*, 504 F.2d 368, 370 (3rd Cir. 1974) (explaining that "[w]ith each shipment United issued to Model a *'Certificate of Compliance' certifying that the parts complied* with the specifications referred to in the purchase order") (emphasis added), *rev'd on other grounds*, 423 U.S. 303 (1976) (emphasis). Liability in

-35-

*Boeing Co.* was based on a similar circumstance. *See Boeing Co.*, 302 F.3d at 643-44 ("Although the loss of Aircraft 89-0165 occurred after Government acceptance and resulted from the defective Speco gear, it was actually caused by Boeing's initial misrepresentation that the helicopter conformed to contract requirements. *This misrepresentation, which triggered FCA liability, is the key to this case*.") (emphasis added). Accordingly, the Government's argument that these cases stand for the application of liability solely on the basis of the provision of a "defective product" is misplaced.

Even had the Government been able to provide some precedential support for the existence of a "defective products" theory, its attempt to explain away the District Court's distinction between a "defective good" and "defective service" is unsuccessful. Int. Br. 31-33. As the District Court correctly noted, "the defective *goods* in [*Bornstein* and *Boeing Co.*] are materially different than a claim for defective *services* as alleged in this case." J.A. 232. A review of those opinions makes this clear. For example, in *Bornstein*, whether the "certification of compliance" was accurate could be objectively and definitively determined. There, the mislabeled products were certified to comply with the "Joint Army Navy qualification approval standard" for those specific electron tubes. *See Bornstein*, 504 F. 2d at 369 ("Each radio kit was to contain two electron tubes designated 'JAN [Joint Army Navy] type 4 x 15G per MIL E-1 specifications.'").

-36-

Here, Triple Canopy's invoices identifying the provision of guards carried no such similar objectively quantifiable expression of compliance with specific standards. For this independent reason, the Government's "defective products" theory fails.

## II.    THE GOVERNMENT'S FALSE RECORDS CLAIMS WERE INSUFFICIENTLY PLEADED

Count Two of the Government's Complaint alleges that Triple Canopy violated 31 U.S.C. 3729(a)(1)(B) by making "false records or statements material to false or fraudulent claims," which were purportedly used to induce the Government's CORs to approve claims and therefore induce the Government to pay for them.   J.A. 45-46. The District Court properly dismissed this claim, because (1) as set forth above, there is no underlying false claim, a prerequisite for a violation of Section 3729(a)(1)(B); and (2) the Government has not specifically alleged reliance by the Government on any purportedly false records.

### A.    The District Court Properly Dismissed The False Records Claim Because The Government Could Not Demonstrate Double Falsity

As an initial matter, given that the Government has not stated a claim under Section 3729(a)(1)(A), its false records claim under Section 3729(a)(1)(B) is facially invalid.   As courts in this Circuit recognize, to plead a claim for false records under Section 3729(a)(1)(B), a plaintiff must allege "double falsity" – namely, "both that (1) a false record or statement was used to obtain (2) a false

claim paid by the government."[10] *United States ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573, 585 (E.D. Va. 2010). This "double falsity" principle is supported by the plain language of Section 3729(a)(1)(B) of the FCA, which provides for liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to *a false or fraudulent claim*" (emphasis added). In other words, without a "false or fraudulent claim" there is nothing to which the alleged "false records" could be "material." Numerous federal courts recognize this principle. *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1329 (11th Cir. 2009) (holding that, to satisfy false records claim, "a plaintiff must prove that the government in fact paid a false claim."); *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 655-56 (S.D.N.Y. 2011) (stating that 31 U.S.C. 3729(a)(1)(B) "establishes a 'double falsity' requirement" whereby "the Government must allege both (i) a false record or statement, and (ii) a false claim."); *United States ex rel. Gonzalez v. Fresenius*

---

[10] Congress amended the False Claims Act's "false records" claim in 2009, previously codified at 31 U.S.C. 3729(a)(2), in part to overturn the Supreme Court's decision in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008). *See* Fraud Enforcement and Recovery Act of 2009 § 4(f), 123 Stat. 1625. *Allison Engine* held that to prevail on a false records claim under the FCA, a plaintiff must show that the defendant made a false record or statement for the specific purpose of getting a false claim paid by the Government. 553 U.S. at 668-69. Although the amendments modified the language so that the "specific purpose" requirement no longer applies, this Court has not subsequently departed from the requirement that a false records claim still requires payment of a false claim at some point.

-38-

*Med. Care N. Am.*, 748 F. Supp. 2d 95, 115 (W.D. Tex. 2010) (holding that false records claim is contingent upon false claim actually being paid). Put simply, because the Government has not properly alleged a violation of Section 3729(a)(1)(A), it cannot properly allege a violation of Section 3729(a)(1)(B). Accordingly, the Government's false records claim must be dismissed.

### B.    The Government Failed To Plead Its False Records Claim With The Requisite Particularity

The Government's false records claim is also improperly pleaded because it fails to allege that any of the allegedly false weapons qualifications scorecards were viewed and relied upon by the Government, and therefore caused it to pay out money. To state an FCA claim for false records, a plaintiff must allege that (1) the defendant made or used a false statement or record; (2) the false statement or record was made or used with the requisite scienter; (3) the allegedly false record or statement was material; and (4) the allegedly false record or statement improperly caused the government to pay out money or forfeit money due. *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc*., No. 1:09-cv-1086, 2011 WL 2182422, at * 3 (E.D. Va. May 4, 2011) (citing *Owens,* 612 F.3d at 728-29).[11]

---

[11] This four-part test remains in place after the 2009 Fraud Enforcement Recovery Act's amendments to the FCA. The FERA states that amendments to the FCA "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date"). Fraud Enforcement and Recovery Act of 2009 § 4(f), 123 Stat. 1625. Both *Takeda* and *Owens* were

Each of these elements must be pleaded with particularity because all FCA claims are held to Rule 9(b)'s pleading standards. *Owens*, 612 F.3d at 731. Therefore, an FCA plaintiff must "at a minimum, describe the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation *and what he obtained thereby*." *Wilson*, 525 F.3d at 379 (emphasis added) (quoting *Harrison I*, 176 F.3d at 784). Under this standard, to properly plead the causation element of such a claim, an FCA plaintiff must specifically allege how the false records actually caused the government to pay out money. *See id.* (Plaintiff must plead "the who, what, when, where, and how of the alleged fraud.")

Here, the Government cannot argue that it has sufficiently pleaded causation, because nowhere does the Complaint allege that a COR or any other government representative viewed and relied upon the scorecards at issue in filling out and signing the DD-250s.[12] Instead, the Government argues, in the face of this

___

decided after the amendments were passed, and both cases involved claims that were still pending after June 7, 2008.

[12] As discussed in Triple Canopy's submissions in the District Court, while the Government's Complaint generally alleges that the COR viewed false records and relied on them to make payments to Triple Canopy, it does so only vaguely, and without any specific facts as to when the COR actually reviewed the false records, what false records he/she looked at, and what claims were paid based on reliance on the false records. *See* Mem. In Supp. Of Def. Triple Canopy's Mot. to Dismiss Intervenor's Compl., Dec. 24, 2012, 17-21 (ECF No. 32). Further, the Government has admitted that it did not name in its Complaint a person who looked at a false weapons certification form and who subsequently filed a DD-250. J.A. 131:7-20;

-40-

Court's precedent to the contrary, that causation is not an element of a well-pleaded false records claim. This attempt fails for a number of reasons.

First, the Government contends that the District Court erred by "effectively import[ing] a presentment requirement into Section 3729(a)(1)(B)" by "requiring allegations that a government official actually reviewed and relied upon the false weapons scorecards compiled by TCI. . . ." Int. Br. 39. Yet in dismissing the Government's false records claim, the District Court "imported" no such thing. Rather, the District Court simply enforced the requirement that the Government plead that the allegedly false records *caused* the payment of a false claim. *See* J.A. 242 ("The Government fails to plead with particularity the existence of a false claim and its reliance upon any false records in submission of a false claim.").[13]

---

*see also* J.A. 134:1-9 (admitting that the Government has not pled information identifying "contracting officers who can say they looked at a particular file associated with a particular guard, in connection with their preparation of the DD250 and then a bill was submitted"). Allegations lacking such detail fall far short of the particularity required to allege causation. *See United States ex rel. Jones v. Collegiate Funding Servs., Inc.,* No. 3:07CV290, 2011 WL 129842, at *16 (E.D. Va. Jan. 12, 2011) ("[i]f Defendants did not submit the allegedly false certifications to someone (in anticipation of transmittal to the government), it is unclear how Defendants could have 'use[d], or cause[d] to be . . . use[d], a false record or statement to get a false or fraudulent claim paid or approved by the government.'").

[13] And even if the issue of causation is instead properly framed as one of "presentment," multiple courts outside this Circuit have nevertheless explicitly held, even after passage of the FERA, that presentment is still required for a false records claim. *See United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) ("to state a claim under the FCA, a plaintiff must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with

This is consistent with the pleading requirements for such a claim; it does not require the Government to allege "presentment," it only requires particular allegations as to how the false records caused "the government to pay out money."

The Government further attempts to undermine the District Court's finding that causation had been inadequately pleaded by arguing that it conflated materiality and causation and thus "employed an outcome-materiality standard focused on whether the false statement *actually* influenced the government's payment decision." Int. Br. 40. This misinterprets the District Court's ruling; it clearly established that materiality and causation are separate elements under Section 3729(a)(1)(B) of the FCA. *See* J.A. 239. ("An FCA claim, whether for false statements under § 3729(a)(1)(A) or false records under § 3729(a)(1)(B), requires . . . (3) that the statement or conduct was material; and (4) that the statement or conduct caused the government to pay out money or to forfeit money due.") (quoting *Owens*, 612 F.3d at 728-29). And, as already noted, to demonstrate causation, the Government needed to allege that the COR – or any Government representative for that matter – *actually viewed* the records and *relied upon them* in

---

the requisite scienter; (3) that was material; and (4) that is presented to the Government."); *United States ex rel. McLain v. Fluor Enterprises, Inc*., Nos. 06–11229, 09–4191, 2013 WL 3899889, at *7 (E.D. La. July 29, 2013) (noting that *Steury* confirmed that pre-FERA "False Claims Act precedent is still good law" and holding that presentment is required to properly allege a violation of § 3729(a)(1)(B)).

-42-

approving a claim for payment. The Government's failure to plead such facts was independently fatal to its second count.

Because the Government cannot plead with particularity that the allegedly fraudulent records caused the government to pay out money, it attempts to discard that pleading element. But, to permit the Government's interpretation would unreasonably expand liability under the FCA, thus enabling FCA plaintiffs to successfully plead a false records claim without alleging how purported false records led to payment by the Government. This runs contrary to this Court's decision in *Owens* as well as its recent affirmation that the causation requirement still applies for both types of FCA claims. *See United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.,* 707 F.3d 451, 455 (4th Cir. 2013) ("we do not reach the additional question whether Relator alleged sufficient facts to support the required causation element for *a claim asserted under the Act*.") (emphasis added); *see also Hopper v. Solvay Pharm., Inc*., 588 F.3d at 1330 (dismissing false records claim because it did not "link the alleged false statements to the government's decision to pay false claims"); *United States ex rel. Longhi v. Lithium Power Techs., Inc*., 575 F.3d 458, 467 (5th Cir. 2009) (adopting Fourth Circuit FCA four-part test discussed above).[14]

_____

[14] While *United States ex rel. Grubbs v. Kanneganti*, may suggest that the Fifth Circuit has stepped back from this conclusion, *Longhi* remains binding within that Circuit. *See* 565 F.3d 180, 193 (5th Cir. 2009) ("the recording of a false record,

In short, the Government's failure to make any specific factual allegations as to when a Government representative viewed Triple Canopy's purportedly false records or how the government relied on such documents in making payments under the contract is fatal to its second count. The District Court was correct to dismiss the Government's false records claim on this independent basis.[15]

---

when it is made with the requisite intent, is enough to satisfy the statute; we need not make the step of inferring that the record actually caused a claim to be presented to the Government."); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 717 n. 39 (N.D. Tex. 2011) (noting that, after *Grubbs* and the 2009 amendments, "the fourth element under the *Longhi* test may no longer be applicable."). However, as noted in *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d at 116, *Grubbs* was decided by a panel, and is therefore not binding to the extent that it conflicts with previous authority in the Fifth Circuit.

[15] In a footnote, the Government suggests that under Section 3729(a)(1)(B), liability for a false records claim can extend *ad infinitum* well after a claim is submitted. *See* Int. Br. 25 (arguing that the false records section of the FCA "extends to false statements made both before *and after* a claim is submitted, so long as those statements are material to the payment of the claim.") (emphasis added) (citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006). However, *Hendow* says no such thing; the circumstances in that case involved an educational institution submitting false claims *after* false records were manufactured by the school. *See Hendow*, 461 F.3d at 1168 ("In this case, relators have raised allegations that the [defendant] knowingly made false statements, and caused false statements to be made, that resulted in the payment by the federal Department of Education of hundreds of millions of dollars."). Needless to say, the Government's theory of liability for false statements that are completely untethered to a particular false claim would broaden liability under Section 3729(a)(1)(B) well beyond any previous understanding in this Circuit.

-44-

### III. MR. BADR'S FIRST COUNT WAS PROPERLY DISMISSED BECAUSE HE LACKED STANDING TO PURSUE IT UPON THE GOVERNMENT'S INTERVENTION

Given the Government's intervention on Count One of Mr. Badr's Complaint, Mr. Badr has no standing to pursue an appeal related to that Count. Nor did he have standing to continue prosecuting that Count in the District Court once the Government intervened. Mr. Badr admits that Count One of his Complaint, as pled, "is virtually identical to the Government's Intervention Complaint Counts I and II." Br. of Appellant 29 ("Rel. Br."). Under such circumstances, the portions of the relator's complaint adopted by the Government are superseded and must be dismissed, while the unadopted portions may proceed as independent claims. *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 648-49 (S.D.N.Y. 2011); *see also United States ex rel. Robinson-Hill v. Nurses' Registry and Home Health Corp.*, No. 5:08–145–KKC, 2012 WL 4598699, at *9-10 (E.D. Ky. Oct. 2, 2012) (ruling that relator's complaint was "entirely superseded by the Government's Complaint and [was therefore] no longer . . . a separate and free-standing FCA cause of action"); *United States ex rel. Allen v. Guidant Corp.*, Civil No. 11-22, 2012 WL 878023, at *6 (D. Minn. March 14, 2012) ("If the government's claims are duplicative of those of the relator, the government's claims become the operative claims when the government intervenes.").

-45-

Despite this authority, Mr. Badr claims that he has standing to pursue an appeal related to Count One, on the grounds that, as a relator, he has "continuing and future potential interest in intervened claims" and that such "interest" extends to active prosecution of claims in which the Government has intervened. Rel. Br. 29. Mr. Badr is mistaken. His "continuing" statutory rights include the ability to remain a party to this action, and an entitlement to a share of any monetary award recovered by the government. *See* 31 U.S.C. 3730(c)(1), (d). However, the fact that Mr. Badr retains *some* statutory rights does not mean that his "continuing and future potential interest in intervened claims" extends to maintaining claims identical to those on which the government has intervened. Nothing in the FCA contemplates permitting relators to wait for the outcome of the intervenor's complaint, and then proceed with identical claims if the relator is unhappy with that outcome.[16] *See United States ex rel. Barajas v. Northrop Corp*., 147 F.3d 905,

---

[16] None of the cases cited by Mr. Badr stand for the proposition that he has some "theoretical right" to continue litigating a claim after the government has intervened and is actively prosecuting that claim. Rel. Br. 30. *See United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 11 (D.D.C. 2003) (discussing history of case, which included joint dismissal of cost-shifting claim by relator and defendant after government had withdrawn that claim); *In re: Vencor, Inc. v. Kindred Healthcare, Inc*., Nos. 99-3199(MFW), 99-3200(MFW), 99-3327(MFW), 2003 WL 2004385, at *3, 5 (D. Del. Apr. 28, 2003) (dismissing appeal of district court's determination that government had authority to settle and dismiss qui tam action). Nor does the case history in *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 465 (2007), which included the relator and the government filing a "joint amended complaint," provide any support for Mr.

-46-

910 (9th Cir. 1998) ("A qui tam relator has Article III standing to sue only as a relator, on behalf of the government. His standing is in the nature of an assignee of the government's claim . . . . Thus there is one claim, the government's, pursuable either by the qui tam relator on behalf of the government, or by the government on its own behalf.").

As the FCA itself indicates, government intervention means that the "action shall be conducted by the Government." 31 U.S.C. 3730(b)(4); *see also United States ex rel. Raggio v. Jacintoport Int'l LLC*, No. 10–01908 (BJR), 2013 WL 2462109, at *2 (D.D.C. June 7, 2013) ("Under the False Claims Act, once the Government elects to intervene in a *qui tam* action, the Government, not the relator, has 'the primary responsibility for prosecuting the action.'") (quoting 31 U.S.C. 3730(c)).  Indeed, the FCA clearly states that where the Government has intervened, it "may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. 3730(c)(2)(A); *see also Feldman*, 808 F. Supp. 2d at 648 (holding that "when the Government decides to intervene in a *qui tam* action, the Government's claims become the operative claims insofar as they are duplicative of those of the relator.").  Here, the Government is clearly prosecuting

Badr's theory that under the FCA, a relator and the government "might do so separately." Rel. Br. 29.

-47-

Count One of Mr. Badr's Complaint. Accordingly, the District Court correctly dismissed Mr. Badr's first count. J.A. 227 n. 1.

## IV. MR. BADR'S COUNTS II-V WERE PROPERLY DISMISSED BECAUSE THEY WERE NOT PLEADED WITH THE REQUISITE PARTICULARITY

Triple Canopy employed Mr. Badr as a medic at Al Asad Airbase from June 2009 until June 2010. J.A. 10. His Complaint included five counts. Mr. Badr's first count claimed FCA violations at Al Asad Airbase. J.A. 15-16. Of the complaint's sixteen paragraphs of "factual allegations," fifteen focused exclusively on conduct at Al Asad. J.A. 11-15. Mr. Badr's Counts II through V (his "non-Al Asad counts") allege FCA violations at four other locations in Iraq, or, as he describes them, the "Cobra," "Kalsue," "Basra," and "Delta" contracts. J.A. 17-22. Mr. Badr was not employed at any of these locations, and his Complaint includes no allegations of conduct – of any type – at them. J.A. 9-22. Instead, employing only one tacked-on paragraph of his "factual allegations," Mr. Badr claims that Triple Canopy's Al Asad guard force was "demobilized [from Al Asad] and transferred" to these other locations. J.A. 15. Without any factual support, Mr. Badr alleges further that these guards were not "qualified to provide" security services on these other "contracts" and that for each, Triple Canopy was "paid by the U.S. Government under terms similar to those under the Al Asad Contract." *Id.*

-48-

"[C]laims under the [FCA] must be pleaded with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure." *Takeda*, 707 F.3d at 455 (citing *Harrison I,* 176 F.3d at 783-85).   Mr. Badr's non-Al Asad counts fail because they lack any factual particularly at all.   Instead, they allege Triple Canopy incurred FCA liability based on nothing more than conjecture, inference, and extrapolation.   For this reason, Mr. Badr's Counts II-V failed to meet the heightened burden imposed by Rule 9(b), and, therefore, the District Court properly dismissed them.[17]

### A.    Mr. Badr's Failure To Allege Presentment Was Fatal To His Non-Al Asad Counts

Mr. Badr's challenge to the District Court's dismissal of his non-Al Asad claims is based on a false premise.   He alleges that to properly plead a violation of Section 3729(a)(1)(A), a relator is not required "to identify specific claims for payment to the government under Rule 9(b), [but] only the specifics of the fraudulent scheme that likely induced the government to make such payments." Rel. Br. 19.   Mr. Badr claims that the District Court "misapprehended" this truism and improperly imposed a requirement to allege an FCA violation that "only

---

[17] As previously explained, the invoices Triple Canopy submitted under TO-11, the Al Asad task order, were not factually or impliedly false, and therefore the Government has failed to properly allege violations of either Section 3729(a)(1)(A) or (B).   For the same reasons, even had Mr. Badr been able to allege facts necessary to meet his Rule 9(b) burden on Counts II-V, they would still fail to allege violations of the FCA.

employees in [a defendant's] billing department" could meet. Rel. Br. 19-20. This is false. The District Court imposed no such standard, and it is Mr. Badr, not the court, who misunderstands the requirements of Rule 9(b) as applied to the FCA.

Despite Mr. Badr's contention otherwise, this Court has clearly – and recently – articulated that "[l]iability under the [FCA] attaches only to a claim actually presented to the government for payment, *not to the underlying fraudulent scheme*."[18] *Takeda*, 707 F.3d at 456 (emphasis added) (citing *Harrison I*, 176 F.3d at 785). For this reason, in such actions, "the critical question is whether the defendant caused a false claim to be presented to the government." *Id.* Here, because Mr. Badr, on his non-Al Asad counts, has "failed to plead plausible allegations of presentment," he "has not alleged all the elements of a claim under the [FCA]." *Id.*; Rel. Br. 19.

_____

[18] Mr. Badr's attempt to distinguish this controlling precedent is unavailing for several reasons. First, he relies entirely on non-Fourth Circuit case law, all of which predates this court's ruling in *Takeda*. Rel. Br. 20-21. Second, the case law on which he relies is either inapposite, or actually supportive of, *Takeda*'s articulation of the pleading standard. *See, e.g., United States ex rel. Simpson v. Bayer Healthcare*, 732 F.3d 869, 876 (8th Cir. 2013) (which dealt with claims arising from a fraudulent inducement theory, which is not alleged here); *Grubbs*, 565 F.3d at 191 (which supports *Takeda's* conclusion because it agrees that a complaint must include "allegations making it likely bills were actually submitted"). Finally, to the extent any of these opinions depart from the standard articulated in *Takeda*, this Court has expressly disavowed their approach. *Takeda*, 707 F.3d at 457-58 ("To the extent that other cases apply a more relaxed construction of Rule 9(b) in such circumstances, we disagree with that approach.").

-50-

Mr. Badr's non-Al Asad counts include no specific allegations that a claim was actually presented to the Government for payment. Instead, he claims only that guards that had been stationed at Al Asad were transferred to these other contracts and that "[Triple Canopy] was paid by the U.S. Government [at these locations] under terms similar to those under the Al Asad Contract." J.A. 15. Such unsupported allegations are insufficient to state an FCA claim. *Takeda*, 707 F.3d at 458. Relators are not permitted "merely to describe a private scheme in detail but then [] allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* at 457-58. Yet this is exactly what Mr. Badr has done. In a conclusory fashion, he only alleges that Triple Canopy "knowingly presented or caused to be presented to the United States Government, false claims for payment or approval under the [non-Al Asad] Contract[s]. . . ." J.A. 17-21. Such allegations are insufficient because they do not support the conclusion that Triple Canopy's actions necessarily led to the submission of false claims at the non-Al Asad locations. *Takeda*, 707 F.3d at 457. Mr. Badr does not allege under what contract vehicles Triple Canopy provided services at these locations, when it provided services at these location, which department or agency Triple Canopy contracted with to provide services at these locations, or offer any specifics at all regarding how Triple Canopy billed for

-51-

services at these locations. In other words, Mr. Badr has failed to provide "any stated reason for his belief that claims requesting illegal payments" must have been, were likely, or should have been submitted at these locations. *Id.* For this reason, Mr. Badr's non-Al Asad counts fail to meet the burden imposed by Rule 9(b) and were properly dismissed.[19]

### B. Mr. Badr's Failure To Allege Any Specific Facts To Support His Non-Al Asad Counts Was Fatal To Those Claims

Mr. Badr also argues that the District Court erred by imposing upon him the "unreasonable" burden of "hav[ing] personally experienced every aspect of the fraud he alleges. . . ." and "provid[ing] the evidentiary minutia underlying those allegations." Rel Br. 26-27. He is wrong. Mr. Badr's non-Al Asad claims were not dismissed because he failed to "personally experience" every aspect of the fraud he claims occurred there or because he failed to identify the "evidentiary minutia" of those causes of action. Counts II-V were dismissed because Mr. Badr failed to allege *any* aspect of the fraud he claims occurred at those locations. He therefore failed not only to plead those claims with the particularity required by Rule 9(b), but also failed to offer any allegations "to raise a right of relief [on those counts] above the speculative level." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

---

[19] Because Mr. Badr has not properly alleged presentment, none of his non-Al Asad counts allege a violation of Section 3729(a)(1)(A). As explained in Argument Section II, *supra*, because Mr. Badr has not alleged a "false claim," his "false statement" causes of action also fail.

As Mr. Badr concedes, "[t]o satisfy Rule 9(b), a plaintiff asserting a claim under the Act 'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Takeda*, 707 F.3d at 455-56 (quoting *Wilson*, 525 F.3d at 379); Rel Br. 13. Yet, for each of his non-Al Asad claims, Mr. Badr fails to provide any allegations regarding the "who, what, when, where, and how of the alleged fraud." *Wilson*, 525 F.3d at 379. In fact, his Complaint contains no averment of any conduct – fraudulent or otherwise – at the non-Al Asad locations. As the District Court properly concluded, Mr. Badr "does nothing more than simply presume . . . that [Triple Canopy] failed to perform its duties as required by those non-Al Asad contracts and billed for unperformed services." J.A. 238. A well-pleaded claim cannot be based on such presumptions.

That Mr. Badr argues he "allege[d] what he knows" and that he "state[d] it in the Complaint as fact [unqualified guards were sent to other TCI bases in Iraq]" does not undermine this conclusion. Rel Br. 26, 28. Rather, it serves only to demonstrate that Mr. Badr conflates the allegations relevant to his first count with his non-Al Asad counts. While Mr. Badr may claim to "know" what occurred at Al Asad, he cannot credibly claim to "know" – and therefore cannot allege or state

-53-

"as fact" – what occurred at the non-Al Asad locations.[20]  Mr. Badr may claim that the guards remained unqualified at the non-Al Asad locations.  Yet, without actual factual allegations supporting that conclusion, it is equally plausible that the guards re-qualified upon their arrival on those other contracts, or that they were sent home before being billed to the government on those contracts, or that they were assigned to another position at those other locations that did not require weapons.  Simply, Mr. Badr's non-Al Asad claims are impermissibly conclusory.

Mr. Badr has no idea what occurred at the non-Al Asad locations, but only the hope that he would develop some understanding of the conduct that occurred there during the course of discovery.  This Court has previously sought to prevent such "fishing expeditions" through the proper application of Rule 9(b)'s pleading requirements.  *Harrison I*, 176 F.3d at 784.  In fact, FCA claims that "rest

---

[20] On this point, Mr. Badr's attempt to distinguish the District Court's reliance on *United States ex rel. Carter v. Halliburton, Co.*, No. 1:08cv1162, 2009 WL 2240331 (E.D. Va., July 23, 2009) is unavailing.  Rel Br. 26-27.  Mr. Badr argues that in *Carter*, "the relator was merely speculating what other people were doing at other places, but had no actual knowledge of their conduct."  Rel Br. 27.  Mr. Badr attempts to differentiate his allegations from *Carter's* by explaining he "*knows* these guards were unqualified based on his observation of [Triple Canopy]'s course of fraudulent conduct at Al Asad and that those same guards were still unqualified at the time they transferred to the post-Al Asad bases."  *Id.*  This reasoning fails because Mr. Badr refuses to take it to its logical conclusion.  While he alleges he "knows" the guards were unqualified "at the time they transferred to the post-Al Asad bases," he cannot know whether they *remained* unqualified after they left Al Asad.  Accordingly, just as was the case in *Carter*, Mr. Badr is "merely speculating what other people were doing at other places . . . [with] no actual knowledge of their conduct."  *Id.*  Given his characterization of *Carter*, Mr. Badr should agree this is improper.

-54-

primarily on facts learned through the costly process of discovery … [are] precisely what Rule 9(b) seeks to prevent." *Takeda*, 707 F.3d at 456 (quoting *Wilson*, 525 F.3d at 380). Because Counts II-V of Mr. Badr's Complaint rely exclusively on inference and extrapolation, they "utterly fail[] Rule 9(b)'s demand for particularity." *Harrison I*, 176 F.3d at 789. For this independent reason, they were properly dismissed.

## CONCLUSION

The False Claims Act is a punitive, specific remedy, one reserved for instances where a contractor has actually submitted a false claim for payment. Because Triple Canopy did not, no amount of molding or repackaging can now form the facts alleged into properly-pleaded FCA causes of action. Neither the Government nor Mr. Badr allege the submission of a factually or legally false claim, or the creation of a false record that caused the Government to pay out money. As the District Court correctly found, the Complaints fail to properly state a claim for FCA liability. For that and all the foregoing reasons, Triple Canopy respectfully requests that this Court affirm the District Court's dismissal of the Government's Complaint and Mr. Badr's Complaint.

## REQUEST FOR ORAL ARGUMENT

Triple Canopy respectfully requests oral argument on all of the issues presented in these appeals.

Dated:  January 30, 2014                    Respectfully submitted,


                                            /s/ Tara M. Lee
                                            Tara M. Lee
                                            Joseph C. Davis
                                            DLA Piper LLP (US)
                                            11911 Freedom Drive, Suite 300
                                            Reston, Virginia 20190
                                            Tel: (703) 773-4000
                                            Fax: (703) 773-5000

                                            Paul D. Schmitt
                                            DLA Piper LLP (US)
                                            500 Eighth Street, N.W.
                                            Washington, D.C. 20004
                                            Tel: (202) 799-4524
                                            Fax: (202) 799-5524

                                            *Counsel for Appellee*
                                            *Triple Canopy,Inc.*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a) OF THE FEDERAL
RULES OF APPELLATE PROCEDURE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,882 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

 /s/ Tara M. Lee
*Counsel for Appellee*
*Triple Canopy, Inc.*
Date: January 30, 2014

-58-

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 30th day of January, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which will send notice of such filing to the following registered CM/ECF users:

Charles W. Scarborough
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530
Email: charles.scarborough@usdoj.gov

Richard W. Sponseller
Peter Hyun, Esq.
Assistant U.S. Attorneys
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, VA 22314
Email: richard.sponseller@usdoj.gov
Email: peter.hyun@usdoj.gov

Paul A. Prados
Earl N. Mayfield , III
DAY & JOHNS, PLLC
10560 Main Street, Suite 218
Fairfax, VA 22030
Email: pprados@dayjohns.com
Email: tmayfield@lewis-firm.com

I further certify that on this 30th of January, 2014, I caused the required copies of the Brief of Appellee to be hand filed with the Clerk of the Court.

/s/ Tara M. Lee
*Counsel for Appellee*
*Triple Canopy, Inc.*
Date: January 30, 2014

-59-